# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

James Monroe Houchens

    v.

Rector and Visitors of the
University of Virginia et al.

## Case No. (Law) 4598

By JUDGE JAY T. SWETT

March 5, 1991

In this medical malpractice action, plaintiff seeks to compel the Commonwealth of Virginia (University of Virginia Hospital) to respond to certain discovery requests. More specifically, in Interrogatory 8, plaintiff asks that the Hospital state whether any witnesses to the incident made oral or written statements regarding "their version or perception as to the events surrounding the incident," that the Hospital state whether any such statement was oral or in writing, state to whom the statement was made, when it was made, and the substance of each statement. In Interrogatory 10, plaintiff asks whether the Hospital conducted an investigation or audit of "the care provided for the plaintiff" and, if so, to identify

those who conducted such investigation or audit and to provide a summary of the results. In a request to produce documents, plaintiff asks for documents relating to the purchase, maintenance, and use of the heat lamps used to treat plaintiff.

In his suit, plaintiff contends that the Hospital and several nurses negligently used heat lamps while post-operatively treating the plaintiff. Plaintiff contends that depositions of the nurses who treated the plaintiff have been taken and all have testified that the lamps were properly used.

Defendant argues that witness statements, if they exist, are not discoverable. First, statements of those who are defendants made to their attorneys are protected by attorney-client privilege. Second, statements of witnesses who are not parties to the suit, but which were obtained in anticipation of litigation or for trial, are work product and are not discoverable until the requesting party has shown a substantial need of such statements. Rule 4:1(b)(3). Finally, defendant argues that this interrogatory would require defendant to produce witness statements that are "privileged" under Virginia Code § 8.01-581.17, a portion of the Virginia Medical Malpractice Act.

Plaintiff concedes that defendant need not produce statements protected by the attorney-client privilege. While plaintiff perhaps did not concede the work product privilege, this matter was not fully developed, at least to the extent that the court can find, at this stage, that witness statements otherwise protected under Rule 4:1(b)(3) should be disclosed.

The third basis for the objection, the statutory privilege available under the medical malpractice statute, rests upon the exception in the statute which would provide for such discovery only "for good cause arising from ex-traordinary circumstances." § 8.01-581.17. Here, plaintiff argues that extraordinary circumstances exist sufficient to justify a finding of good cause because plaintiff's postoperative unconscious condition rendered him incapable of knowing what occurred with regard to the use of heat lamps. The only ones who know what occurred are either defendants or employees of the defendant Hospital. Deposi-tions apparently have been taken of these witnesses and

have not given plaintiff the evidence that he feels is necessary to the development and presentation of his case.

There is little authority as to what constitutes "extraordinary circumstances" sufficient to justify an exception to the statutory privilege that attaches to statements prepared for medical staff committees or utilization review committees. However, something more must be shown than the fact that plaintiff was unconscious at the time the treatment was rendered. The word "extraordinary" must be given its plain meaning. This case would be different perhaps if those who were witnesses to the event were no longer available and their only version of the events were contained in statements presented to a medical staff committee. Those circumstances are much closer to what the court believes was the intent of the legislature in allowing such statements to be produced only under "extraordinary circumstances." For these reasons, the court denies plaintiff's motion to compel defendant to respond to Interrogatory 8 to the extent that the statements come within attorney-client privilege, work product or privilege under § 8.01-581.17. Conversely, answers about statements that do not fall under the attorney-client privilege, the work product doctrine, or the statutory privilege just discussed should be given if they exist.

In Interrogatory 10, plaintiff asks whether "an investigation or audit" of plaintiff's care was conducted by the Hospital. Defendant objects again based on statutory privilege under § 8.01-581.17. During argument on this point, the court raised a question as to the extent of the privilege under § 8.01-581.17. For example, what if there was an informal investigation or review done immediately after the discovery of plaintiff's injury that was not part of a medical staff committee or utilization review committee. If such was the case, then the statutory privilege would not necessarily attach to such an investigation. At this point, there is no way to tell. At this stage, it would appear appropriate for defendant to respond to Interrogatory 10 to the extent that there is information directly responsive to the interrogatory, particularly whether any investigation or audit was undertaken and, if so, to give the names of those involved. If the investigation is one that is privileged under the statute, then the results of the investigation need not be produced.

Providing background information, however, would provide a basis to support the invocation of the privilege. Accordingly, defendant should respond to Interrogatory 10 in such a way as to answer whether an investigation or audit was done and, if it was, to state the names of those involved in the investigation.

The final discovery request relates to the production of documents regarding the use and operation of heat lamps. Defendant has objected to producing manuals, standing orders, protocols, or other documents relating to the use of heat lamps on the basis that such documents do not relate to the issue of standard of care.

Plaintiff argues that regardless of the standard of care issue, the documents are relevant on the issue of sovereign immunity. Here, the defendant nurses contend they are immune from liability because they are employees of a state-run hospital. The resolution of the sovereign immunity issue requires the application of a four-part test. *Gargiulo v. Ohar*, 239 Va. 209 (1990); *James v. Jane*, 221 Va. 43 (1980). Elements of that test involve the extent to which the employee exercises discretion in treatment of patients. Another element is the extent to which the work of the employee is subject to the control and direction of the employer. It appears to the court that the extent to which the nurses were or were not obligated to abide by standing orders, protocols, or manuals is relevant to the determination of sovereign immunity. Accordingly, the court concludes that defendant should provide documents that are responsive to plaintiff's request for production of documents regarding the use and operation of heat lamps. The court reserves any ruling on whether the documents would be admissible at trial regarding the issue of standard of care.

July 11, 1991

A plea of sovereign immunity has been filed on behalf of defendants, Katherine J. Ballenger-Farrington, Jacquelyn M. Sims, and Trudy Colaw, registered nurses employed by the University of Virginia Medical Center. In June, 1989, all were employed as critical care nurses assigned to the thoracic cardiovascular surgery service, a postsurgical recovery unit specializing in the care of patients who

have recently undergone cardiovascular surgery. Evidence on the plea was presented on May 30, 1991. The matter has been briefed and argued by counsel. Before announcing the ruling of the court, a brief statement of facts may be helpful.

On June 27, 1989, plaintiff, James Monroe Houchens, underwent abdominal aortic aneurism repair surgery at the University of Virginia Medical Center. Mr. Houchens, then 79 years old, was experiencing a number of serious medical problems at the time of his surgery. He had recently undergone quadruple bypass heart surgery. He also had a history of diabetes as well as vascular and cardiac artery disease.

Following surgery, Mr. Houchens was taken to the thoracic cardiovascular postoperative intensive care unit. This postoperative unit, referred to as the "TCV," is a special unit designed to provide postsurgical critical care to patients who have undergone complex cardiovascular surgery. In most cases, as in the case of Mr. Houchens, the patients come from surgery in close to, if not in, critical condition. While in the TCV unit, patients are closely monitored by nurses who have received specialized training and are qualified to provide critical care nursing services.

When Mr. Houchens was first admitted to the TCV unit, Ms. Ballenger-Farrington was the "primary nurse 2" which meant that she was the assistant head nurse and had principal responsibility for his care. Also in the TCV unit when Mr. Houchens was admitted was Ms. Sims who had only recently been assigned to the TCV unit and was in an orientation training program under Ms. Ballenger-Farrington. Ms. Ballenger-Farrington and Ms. Sims provided postoperative care for Mr. Houchens until the end of their shift, approximately 7:00 or 7:30 p.m. At that time Ms. Colaw became the primary nurse and provided nursing care for Mr. Houchens for the next twelve hours. Ms. Ballenger-Farrington, Ms. Sims, and Ms. Colaw are registered nurses who have received special training in providing postoperative critical care services of the type provided in the TCV unit.

When initially admitted into the unit, Mr. Houchens was hypothermic, or very cold, because during surgery, his body temperature had been reduced in order to offset

the effects of the reduced blood flow. In the TCV unit, in addition to monitoring his vital signs, the nurses applied two sets of heat lamps to raise Mr. Houchens's body temperature. Various medications also were given to deal with the hypothermia and his high blood pressure.

While in the TCV unit, Mr. Houchens sustained serious burns to his right leg allegedly caused by the heat lamps either being placed too close to Mr. Houchens's leg or being left on for too long. Mr. Houchens has undergone additional surgery as a result of the burns. In this suit, he seeks to recover against the University of Virginia and defendants Ballenger-Farrington, Sims, and Colaw alleging that their negligent use of the heat lamps in the TCV unit caused his leg burns.

Other testimony relevant to the plea of sovereign immunity included the following. Each of the nurses was a full-time employee of the University of Virginia Medical Center and therefore an employee of the Commonwealth. Nurses in the TCV unit have no choice in the selection of patients whom they care for in the TCV unit. They are required to comply with all policies, protocols, and procedures for the TCV unit, including those calling for the use of heat lamps. The nurses regularly interact with the surgeons, as well as the doctors assigned to the TCV postoperative unit.

The University of Virginia Medical Center's cardiovascular surgery service, because of its highly specialized nature, receives referrals from other localities in the Commonwealth, as well as referrals from West Virginia. Similar surgery services and units like the TCV unit exist at the Medical College of Virginia in Richmond, as well as in Norfolk, Roanoke, and Fairfax. MCV and the Norfolk hospitals are state hospitals, whereas the Roanoke and Fairfax hospitals are private.

Since *James v. Jane*, 221 Va. 43 (1980), the question of whether governmental employees are entitled to sovereign immunity and therefore immune from liability for acts of simple negligence involves the application of a four-part test. The four components of the test, also described as "factors to be considered" in *Messina v. Burden*, 228 Va. 301, 313 (1984), are as follows:

> (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in the function; (3) the degree of control and direction exercised by the state over the employee; and (4) whether the act complained of involved the use of judgment and discretion.

After *James v. Jane*, the test has been applied in a variety of circumstances. In *Messina v. Burden, supra*, a building superintendent of Tidewater Community College and the operations chief of the Public Works Department of Arlington County were immune from suit when persons were injured in a fall on a stairway at Tidewater Community College and a fall over a manhole cover in Arlington County. In *Lentz v. Morris*, 236 Va. 78 (1988), a high school teacher supervising a physical education class could not be sued for simple negligence by a student injured while a member of the class. In *Gargiulo v. Ohar*, 239 Va. 209 (1990), a physician assigned to a research and training program at MCV could not be sued for simple negligence allegedly committed against a patient participating in the program. In *Colby v. Boyden*, 241 Va. 125 (1991), a police officer could not be sued for simple negligence for allegedly causing an accident while pursuing a fleeing lawbreaker. In *Heider v. Clemons*, 241 Va. 143 (1991), a deputy sheriff was not entitled to sovereign immunity while operating his motor vehicle while in the course of serving suit papers. Most recently in *National Railroad Passenger Corp. v. Catlett Volunteer Fire Co.*, 241 Va. 402 (1991), a member of a volunteer fire company could not be sued for simple negligence for failure to stop at a railroad crossing while responding to an emergency call to extinguish a fire. While some of these cases did not discuss the application of the full four-part test, the cases do affirm our Supreme Court's position that the doctrine of sovereign immunity is alive and well.

In addition to *James v. Jane* and *Gargiulo v. Ohar*, a third case particularly instructive here is *Lawhorne v. Harlan*, 214 Va. 405 (1973), *overruled on other grounds*, *First Virginia Bank - Colonial v. Baker*, 225 Va. 272 (1983). In *Lawhorne*, the Supreme Court held that a surgical intern engaged in a postdoctoral course of training at a state

hospital was immune from liability for simple negligence, 214 Va. at 407. In contrast, in *James v. Jane, supra,* the defendant physicians were not immune from suits for ordinary negligence where the acts complained of occurred in the course of treating their patients. Since the issue here involves the immunity of three critical care registered nurses employed by the University of Virginia Medical Center, these two cases and *Gargiulo v. Ohar,* are the ones which offer the most guidance in applying the doctrine.

My reading of the cases applying the four-factor test does not indicate that one particular factor is more important than any other. On the contrary, it appears that the importance of the factors may vary depending on the particular set of circumstances. What seems to be required, however, is that each of the four factors must be satisfied before a plaintiff is barred from pursuing a claim for injuries allegedly caused by the negligence of a governmental employee.

In resolving the question of the nurses assigned to the TCV postoperative intensive care unit, I find that two of the four factors do not call for the application of sovereign immunity in this case. More particularly, I find the nature of the function performed by the three nurses as well as the state's interest in that function do not rise to a level sufficient to afford immunity from suit. I do conclude that the evidence is sufficient with regard to the other two factors. The evidence demonstrated that the nurses are called upon to make judgments and exercise discretion while in the course of administering the various elements of postsurgical critical care nursing. While perhaps the application of the heat lamps involved the least amount of discretion, it is clear that the use of the heat lamps cannot be dealt with in isolation. While in the TCV unit, the nurses were involved in a variety of functions regarding the care of Mr. Houchens, one component of which was the application of heat lamps to raise his body temperature.

The evidence was sufficient also to establish that the Commonwealth, through the University of Virginia Medical Center, exercised substantial control and direction over the actions of its employees. Unlike the physicians in *James v. Jane,* but similar to the physicians in *Gargiulo v. Ohar,* the TCV nurses were not involved in selecting

which patients were admitted into the unit, they were required to comply with established protocols and procedures, they had no input with regard to patient billing, and whatever compensation they received was solely in the form of salary. There is no question that this component of the four-part test was satisfied.

Turning now to the nature of the function performed by these nurses and the extent of the state's interest in that function, it is my conclusion that the nurses in the TCV unit are not entitled to immunity from suit for acts of simple negligence. My conclusion is drawn from a comparison of *James v. Jane* with *Lawhorne v. Harlan* and *Gargiulo v. Ohar*.

In *James*, the Supreme Court discussed the dual function of the physicians assigned to the University of Virginia Medical Center. One of their responsibilities was to teach at the Medical School. However, they were also involved in treating patients. In *James*, the alleged acts of negligence occurred in the course of treating patients. In comparing the two functions being performed by the doctors, the Supreme Court recognized that the Commonwealth had a significant interest in the operation of a good medical school and in having trained physicians to teach in and to administer the school. 221 Va. at 54. On the other hand, while the Commonwealth was deemed "interested and concerned" that patients received proper medical care, the interest of the Commonwealth *in its sovereign capacity* in the treatment of specific patients while at the University of Virginia Medical Center was considered "slight." *Id.*

In contrast, the function performed by the doctor in *Gargiulo* was that of a participant in a program of basic medical research designed to study scleroderma, including the effect of certain drugs in reducing the incidence and severity of pulmonary hypertension. 239 Va. at 211. Although the specific act of negligence in *Gargiulo* involved the insertion of a heart catheter, the procedure was but one component in a program where the principal function was basic medical research. The Supreme Court found that the Commonwealth's interest in the type of research being performed was significant. 239 Va. at 213.

In this case, the critical care nurses assigned to the TCV postoperative unit are principally if not ex-

clusively involved in caring for patients. Their function is not oriented toward research as was the case in *Gargiulo* or education and training as was the case in *Lawhorne*. They are more like the physicians in *James v. Jane* in that their function is to provide medical nursing care to patients admitted into the TCV unit.

While it is true that the Commonwealth has an interest in seeing that its citizens have highly specialized cardiac and thoracic surgical units available to them, this interest is analogous to its general concern that patients treated at the University of Virginia receive proper medical care. As previously noted, a general interest in having citizens receive quality medical care was deemed to be "slight" when viewed in the context of the state's interest as a sovereign. *James v. Jane*, 211 Va. at 54.

Any application of the doctrine of sovereign immunity should be considered in the context of the public policy and purposes that lie behind the doctrine. As stated in *Lentz v. Morris*, the doctrine serves important public purposes, including "protecting the public purse, providing for smooth operation of government, eliminating public inconvenience and danger that might spring from officials being fearful to act, assuring that citizens would be willing to take public jobs and preventing citizens from improperly influencing the conduct of governmental affairs through the threat or use of litigation." 236 Va. at 81.

Considering the policy that supports the doctrine and its application to the facts here, it is difficult to see how the purposes of the doctrine would be served by having critical care nurses assigned to the TCV unit immune from acts of simple negligence. For example, it is unlikely that the absence of immunity for critical care nurses in the circumstances presented here would make them fearful to act or unwilling to accept employment in the TCV unit. Denying immunity to TCV nurses would not, in my view, lessen the smooth operation of the hospital or lead to improperly influencing the conduct or operation of the hospital through the threat or use of litigation.

In conclusion, the plea of sovereign immunity is denied. Neither the nature of the function performed by the nurses assigned to the TCV unit nor the Commonwealth's interest in that function are sufficient to warrant immunity from acts of simple negligence. The primary function of

these nurses is to provide highly skilled critical nursing care to the patients assigned to the TCV unit. The state's interest in providing this nursing care does not rise to the level where sovereign immunity should bar suit for acts which are alleged to be negligent.