PAIGE LOHR

v.

DOUGLAS LARSEN, M.D.

Record No. 921180

June 11, 1993

Present: All the Justices

*Thomas E. Albro (Christine Thomson; Tremblay & Smith*, on briefs), for appellant.

*Marshall H. Ross (Ronald D. Hodges; Charles F. Hilton; Wharton, Aldhizer & Weaver*, on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

In this medical malpractice case, we decide whether a state-employed public health physician is entitled to the protection of the doctrine of sovereign immunity from liability for his alleged acts of ordinary negligence.[1]

Paige Lohr filed this action against Dr. George Douglas Larsen, a salaried state employee, alleging medical malpractice on his part in failing to order mammograms and needle biopsies after Dr. Larsen detected a lump in Lohr's right breast. After hearing evidence and argument of counsel, the trial court sustained Dr. Larsen's plea of sovereign immunity and dismissed the motion for judgment. Lohr appeals.

No transcript of the evidence or statement of facts has been filed. Therefore, we state the pertinent facts from the allegations of negligence in Lohr's motion for judgment (which the trial court accepted as true for the purposes of its ruling) and from the trial court's findings of fact as stated in its opinion letter.

In July 1988, Lohr went to the Waynesboro Public Health Clinic seeking birth control pills that are issued under its family planning program. This clinic, funded by the Commonwealth and by local governments to supply limited public health services to citizens who cannot afford to pay for private health services, is controlled and staffed by the State Department of Health.

After establishing her eligibility for the program, Lohr returned to the clinic on July 14, 1988. There, in conformity with state regulations, a public health nurse updated Lohr's medical history, provided Lohr with patient education, and took a blood sample. Dr. Larsen then examined Lohr.

The Commonwealth required that Lohr have a physical examination before Dr. Larsen could prescribe birth control pills. Included within the state-defined scope of the examination was a breast examination. However, because the Commonwealth does not provide the funds, equipment, or authority for further examination or treatment, should the need for further medical services become apparent in such an examination, the person examined is referred to other health care providers for treatment.

Dr. Larsen, a board-certified obstetrician and gynecologist, was assigned by the Commonwealth to provide certain medical services

---

[1] In 1981, the Commonwealth abrogated its own immunity from tort liability for acts of simple negligence performed by its employees acting within the scope of their employment, but specifically preserved the immunities enjoyed by state employees. Code § 8.01-195.3.

to the clinic. The trial court described the Commonwealth's control of Dr. Larsen's function at the clinic in the following language:

> [T]he State . . . controls, absolutely, when and where Dr. Larsen works, the number and identity of the patients he sees, the equipment he uses, the procedures he can perform and those which he must refer and even the brand name of the medication he can prescribe. He cannot refuse to see any patient, his compensation is not related in any way to the number of the patients he sees or the services he performs for them and he has no input at all into what fee, if any, the patient will be charged.

Following the July 14 examination of Lohr, Dr. Larsen prescribed birth control pills for her. On August 18, Dr. Larsen examined Lohr a second time after she called the clinic to report that she had discovered a lump in her right breast. Dr. Larsen recommended that Lohr discontinue drinking fluids containing caffeine, and that she "do self examinations for one to two months to see if the lump changed." However, he did not order or recommend a mammogram or a needle biopsy of the lump, either then or two months later, when Lohr reported to him on October 27 that she still had the lump in her breast.

On December 7, after Lohr reported that the lump had grown in size and hardened, Dr. Larsen again examined her and noted that the lump was "definitely suspicious." His notes also stated, "refer to a general surgeon ASAP." Lohr alleges that Dr. Larsen did not advise her that the matter was urgent.

When a general surgeon examined Lohr on January 5, 1989, he noted a much larger lump than was recorded in Dr. Larsen's notes of his December 7 examination. Two mastectomies were later performed on Lohr, one on February 20 and a second on March 27. The first operation confirmed that Lohr "had a stage II infiltrating ductal adenocarcinoma with intralymphatic tumor and vascular invasion." Since that time, Lohr has undergone chemotherapy and "remains at high risk for recurrence of her carcinoma."

Lohr claims that Dr. Larsen's plea of sovereign immunity should be denied because his function was similar to that of medical school faculty member-physicians who were denied sovereign immunity from claims of ordinary negligence asserted by their private patients in *James v. Jane*, 221 Va. 43, 282 S.E.2d 864 (1980).

*James* established the test we use in determining government employees' claims of immunity in the following language:

> [W]e examine the function [the] employee was performing and the extent of the state's interest and involvement in that function. Whether the act performed involves the use of judgment and discretion is a consideration, but it is not always determinative. . . . Of equal importance is the degree of control and direction exercised by the state over the employee whose negligence is involved.

We will apply the *James* test in this case.

### *Employee's Function — Commonwealth's Interest and Involvement Therein*

In *James*, we indicated that if the function that a government employee was negligently performing was essential to a governmental objective and the government had a great interest and involvement in that function, those factors would weigh in favor of the employee's claim of sovereign immunity. *Id.* at 53-54, 282 S.E.2d at 869. On the other hand, if that function has only a marginal influence upon a governmental objective, and the government's interest and involvement in that function are ''slight,'' these factors weigh against granting governmental immunity to a government employee. *Id.* at 54, 282 S.E.2d at 870.

The *James* defendants had private and staff patients and were ''under no obligation to accept any individual'' as a patient. 221 Va. at 47, 282 S.E.2d at 866. Although these physicians received no direct benefit from the fees that their private patients paid for their services, they indirectly benefitted from those fees because the fees were used in operating the medical school, which paid the physicians' salaries, and in funding a portion of their retirement benefits. *Id.* at 48, 282 S.E.2d at 866. The physicians in *James* were also authorized to compromise or forgive their charges to patients. *Id.* at 49, 282 S.E.2d at 866.

In *James*, ''the paramount interest of the Commonwealth of Virginia [was] that the University of Virginia operate a good medical school and that it be staffed with efficient and competent administrators and professors.'' *Id.* at 54, 282 S.E.2d at 870. But the allegedly negligent acts of the *James* physicians were not undertaken in

furtherance of the Commonwealth's interest in providing medical education. And we indicated that although the Commonwealth had the same interest and concern in treatment of the private patients in *James* which it had in the treatment of every patient treated in the Commonwealth, the Commonwealth's interest and control over the *James* physicians was "slight." *Id.* In later cases, we characterized the function of those physicians as that of "independent contractors," *Messina v. Burden*, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984), and "essentially private practitioners," *Bowers v. Commonwealth*, 225 Va. 245, 252, 302 S.E.2d 511, 515 (1983).

▮ In contrast to *James*, the trial court found that Dr. Larsen could neither choose his patients nor forgive any part of the fees fixed by the clinic for his services. And the other evidence indicated that Dr. Larsen's salary and retirement benefits had no relation to fees paid by persons who received clinic services. The Commonwealth's much greater interest and involvement in Dr. Larsen's function is evident from the court's finding from the evidence that "the Commonwealth is attempting to provide quality medical care in certain specified areas for citizens of this State who are economically unable to acquire those services in the private sector."

And the trial court quoted the General Assembly's description of the purposes of its overall health program, of which the clinic's family planning program was a part, in the following pertinent language, "the protection, improvement and preservation of the public health and of the environment are *essential* to the general welfare of the citizens of the Commonwealth." Code § 32.1-2 (emphasis added in the trial court's quotation). Furthermore, the trial court concluded that these health care services could not be delivered without using skilled physicians.

▮ We conclude the trial court correctly held that at the time he was treating Lohr, Dr. Larsen was performing a function which was an essential part of the clinic's delivery of its health care services. The clinic's program in turn plays an integral role in the Commonwealth's objective of "the protection, improvement and preservation of the public health [which is] essential to the general welfare of the citizens of the Commonwealth."

### Dr. Larsen's Use of Judgment and Discretion

▮ To facilitate the efficient and effective operation of government, the exercise of the discretion vested in government employees

should not be affected by threats of personal liability arising from the use of such discretion. *Messina*, 228 Va. at 308, 321 S.E.2d at 661. And because a government employee is liable for negligence in performing a ministerial act, *see First Virginia Bank-Colonial v. Baker*, 225 Va. 72, 78, 301 S.E.2d 8, 11 (1983), a government employee's use of judgment and discretion is an element in determining the issue of immunity. A necessary part of an immunity analysis is the level of discretion required of a government employee in performing his job and whether the employee is exercising that discretion in the discharge of his duties when the allegedly negligent act occurred.

However, as we pointed out in *James*, the use of judgment and discretion "is not always determinative." 221 Va. at 53, 282 S.E.2d at 869. Thus, because the broad discretion vested in the physicians in *James* was not attendant to actions that were integral to the Commonwealth's interest or function, there was no immunity. In this case, however, as we have pointed out, the exercise of discretion by Dr. Larsen was an integral part of the Commonwealth's health care program.

Lohr recognizes that if a broad discretion is vested in a government employee in performing the function complained of, as all parties recognize was the case with Dr. Larsen, it will weigh heavily in favor of a government employee's claim of immunity. But Lohr distinguishes discretionary medical decisions from discretionary governmental "policymaking" decisions.

■ We have not limited the element of discretion in determining governmental immunity to governmental policymakers; it has been extended to *a state-employed physician*, as was Dr. Larsen, *Gargiulo v. Ohar*, 239 Va. 209, 215, 387 S.E.2d 787, 791 (1990); a police officer in vehicular pursuit, *Colby v. Boyden*, 241 Va. 125, 130, 400 S.E.2d 184, 187 (1991); a high school teacher, *Lentz v. Morris*, 236 Va. 78, 83, 372 S.E.2d 608, 611 (1988); city- and state-employed maintenance supervisors, *Messina*, 228 Va. at 311, 313, 321 S.E.2d at 662, 664; and a state highway resident engineer, *Bowers*, 225 Va. at 253, 302 S.E.2d at 515; and a state-employed surgical intern, *Lawhorne v. Harlan*, 214 Va. 405, 407, 200 S.E.2d 569, 572 (1973). As we said in *Colby*, "[o]ur resolution [of the issue of sovereign immunity] . . . goes beyond determining whether the act constitutes the formulation or execution of policy." 241 Va. at 129, 400 S.E.2d at 186.

*Commonwealth's Control and Direction of Dr. Larsen*

■ The extent of a government's control and direction of its employee also influences our consideration of that employee's claim of immunity. A high level of control weighs in favor of immunity; a low level of such control weighs against immunity. *James*, 221 Va. at 53-54, 282 S.E.2d at 269.

■ At first glance, the issue of wide discretion that influences our consideration of the grant of governmental immunity in applying the third element of the *James* test appears to be at odds with our consideration of a higher level of governmental control in the application of the fourth element of that test in this case. However, when a government employee is specially trained to make discretionary decisions, the government's control must necessarily be limited in order to make maximum use of the employee's special training and subsequent experience.[2]

■ There can be little doubt that the Commonwealth's direction and control of Dr. Larsen was far greater than its control of the physicians in *James*. Those physicians "exercise[d] broad discretion in selecting the methods by which they care[d] for [their patients]." *James*, 221 Va. at 48, 282 S.E.2d at 866. Here, the trial court has found that the Commonwealth controls "absolutely" the equipment Dr. Larsen used, the procedures he could perform and "even the brand names of the medication he [could] prescribe." Furthermore, the *James* physicians could decline to accept a particular person as a patient; Dr. Larson could not.

■ In sum, we conclude that Dr. Larsen satisfies all the elements of the *James* test for application of the doctrine of sovereign immunity. Accordingly, the judgment of the trial court will be

*Affirmed.*

JUSTICE STEPHENSON, dissenting.

---

[2] Lohr attempts to limit the doctrine of sovereign immunity to those instances in which specially trained state employees follow "state-established rules," "state-prescribed methods," or "state-standardized procedures." It is true that we noted these factors as considerations in concluding that the necessary control element of the *James* test was present in *Gargiulo*, 239 Va. at 215, 387 S.E.2d at 791, but we did not indicate that such constraints were *required* to establish the necessary governmental control over a state employee who is a professional.

I respectfully dissent. This case does not involve a mere "surgical intern" as in *Lawhorne v. Harlan*, 214 Va. 405, 405, 200 S.E.2d 569, 570 (1973), or a "fellow" in a research project as in *Gargiulo v. Ohar*, 239 Va. 209, 210, 387 S.E.2d 787, 788 (1990). Instead, the physician-defendant in the present case is a "board-certified obstetrician and gynecologist" in the employ of the Virginia Department of Health.

As recently as 1980, this Court, in a unanimous opinion, refused to grant governmental immunity to a neurosurgeon who was a full-time member of the faculty of the Medical School of the University of Virginia. *James v. Jane*, 221 Va. 43, 282 S.E.2d 864 (1980). In *James*, we stated the following:

> At the point when the physician agrees to treat or operate on a certain patient, although his employment by the [Commonwealth] makes possible the arrangement, the relationship becomes the personal and confidential one of doctor and patient, not the Commonwealth . . . and patient. The physician owes his best professional efforts on behalf of the patient, and the patient expects, and has a right to expect, the same care and attention from the physician that he would receive if he were in a private hospital and the physician in private practice. The exercise by the attending physician of his professional skill and judgment in treating his patient, and the means and methods used, from the very nature of things, are not subject to the control and direction of others.

*Id.* at 50-51, 282 S.E.2d at 867-68.

I submit that the reasoning in *James* is as sound today as it was in 1980. I think it is unreasonable to suggest that the Commonwealth could, or should, exercise control over the doctor-patient relationship that existed in the present case. I agree, as the trial court found and the majority holds, that the Commonwealth has a substantial interest in providing " 'quality medical care' " to persons who are " 'economically unable to acquire those services in the private sector.' " To grant immunity for the negligent act alleged in the present case, however, discourages rather than encourages "quality medical care."

For these reasons, as well as those stated in my dissent in *Ohar*, 239 Va. at 215-17, 387 S.E.2d at 791-92, I would deny Dr. Larsen's plea of sovereign immunity.

JUSTICE HASSELL, with whom JUSTICE KEENAN joins, dissenting.

Today the majority expands the scope of sovereign immunity to include licensed physicians who practice in state health clinics. As a result of the majority's decision, indigent persons who receive negligent health care from such physicians have no remedy in tort against them. Yet, in cases involving identical acts of medical negligence, people who have health insurance or sufficient wealth to retain the services of private physicians are permitted to recover damages against those physicians. I believe that if the cloak of sovereign immunity is to be extended, in effect, to permit this disparity, the General Assembly, and not judges, should do so.

In *James* v. *Jane*, 221 Va. 43, 282 S.E.2d 864 (1980), which is controlling here, we held that certain defendants who were licensed to practice medicine at a state agency were not immune for their acts of medical negligence. The defendants' primary responsibilities, as faculty members of the University of Virginia Medical Center, were teaching, research, and patient care. The defendants' only compensation was a fixed annual salary. The compensation was paid to each faculty member regardless of the amount of money the physician earned for his particular department or the amount of money earned by his department through fees for patient care. Once a patient was admitted to the hospital, whether private or staff, the patient received identical treatment and services. No member of the medical staff could refuse to treat a patient because of the patient's classification.

In *James*, just as here, the physicians argued that they enjoyed the cloak of sovereign immunity and, thus, were immune from a lawsuit because they were salaried employees of a state agency and as part of their duties, they attended and treated patients in a state agency. The physicians relied strongly upon the fact that they did not receive compensation from patients whom they treated. There, we stated:

> The only issue we decide here is whether a physician, employed by an agency of the Commonwealth of Virginia and practicing in a hospital operated by such an agency, should be immune from an action for negligence, i.e., for his failure to exercise reasonable care in attending a patient.

*Id.* at 55, 282 S.E.2d at 870.

We fashioned a four-part test to determine whether the physicians were entitled to the immunity accorded the sovereign:

Under such circumstances we examine the function [the] employee was performing and the extent of the state's interest and involvement in that function. Whether the act performed involves the use of judgment and discretion is a consideration, but it is not always determinative. . . . Of equal importance is the degree of control and direction exercised by the state over the employee whose negligence is involved.

221 Va. at 53, 282 S.E.2d at 869. Applying this test, we stated:

In the case under review the paramount interest of the Commonwealth of Virginia is that the University of Virginia operate a good medical school and that it be staffed with efficient and competent administrators and professors. The state is of course interested and concerned that patients who are treated at the University Hospital receive proper medical care. However, the state has this same concern for every patient who is treated in any private hospital or by any doctor throughout the Commonwealth. This is evidenced by the numerous statutes enacted by the General Assembly of Virginia designed to assure adequate medical care and medical facilities for the people of the state. The state's interest and the state's involvement, in its sovereign capacity, in the treatment of a specific patient by an attending physician in the University Hospital are slight; equally slight is the control exercised by the state over the physician in the treatment accorded that patient. This interest and involvement is not of such moment and value to the Commonwealth as to entitle [the defendant doctors] . . . to the immunity enjoyed by the state.

While there may have been a time when a physician was attracted to teach in a state medical school, and to serve as an attending physician on the staff of its hospital, because of the cloak of immunity afforded him as an employee of the sovereign state, we think that time is past. We cannot conceive of any physician, regardless of his status, practicing medicine in this era without the protection of liability insurance, which he purchases for himself or which is provided for him by his

employer. Realistically, the only interest the state has in affording immunity to the physicians practicing in state hospitals is the probability of an increase in the cost of medical malpractice insurance if such immunity is denied. We do not find this to be such a compelling state interest as to justify the denial of a patient the right to assert a claim against a physician for negligent treatment.

*Id.* at 54, 282 S.E.2d at 870.

Today, the majority apparently abandons the rationale and holding in *James* v. *Jane,* which should be controlling here. The facts in this case are indistinguishable from those in *James.* Dr. Larsen is a public health clinician employed by an agency of the Commonwealth to supply medical services for the central Shenandoah health district. He receives a fixed salary. He is board-certified in obstetrics and gynecology. His duties do not involve research or training. He stated, in his job description, which is a part of the record, and which he signed, that he makes "all patient medical decisions" without supervisory advice, guidance, or prior approval. When Dr. Larsen examined Ms. Lohr, he did not follow any state-established rules, protocol, or procedure. Rather, he relied upon his own experience.

I see no reason to ignore the test that we enunciated in *James* v. *Jane,* which was restated, recently, in *Gargiulo* v. *Ohar,* 239 Va. 209, 387 S.E.2d 787 (1990). The only reason that the majority has chosen not to adhere to *James* v. *Jane* is because it is concerned that physicians might not participate in public health programs unless they are immune for their negligent acts. However, this is a policy decision that should be made by the General Assembly, not this Court. Furthermore, the majority's concern is ill founded because the record reveals that the Commonwealth has liability insurance to cover any acts of medical negligence committed by Dr. Larsen.

Finally, as we observed in *James* v. *Jane,* the grant of sovereign immunity to physicians only promotes substandard health care. Thus, not only does the majority deprive persons who are injured by physicians who practice at a state clinic of a tort remedy against those physicians, but those patients are relegated to a system which promotes the delivery of inadequate medical care.

For these reasons, I would deny Larsen's plea of sovereign immunity.