Present:  All the Justices

TRINICA ANN LEE, AN INFANT, WHO
SUES BY EARTHA K. LEE, HER MOTHER
AND NEXT FRIEND

v.   Record No. 952317        OPINION BY JUSTICE ELIZABETH B. LACY
                                      November 1, 1996
F. JOHN BOURGEOIS, M.D.

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Jay T. Swett, Judge

In this case we consider whether an attending physician employed by the state is entitled to sovereign immunity for alleged acts of simple negligence.

Eartha K. Lee was admitted to the high risk pregnancy service at the University of Virginia Hospital (University Hospital) on September 23, 1985, when she was approximately 28 weeks pregnant.  Dr. Siva Thiagarajah, Lee's attending physician, prescribed a management plan for her medical treatment.  Dr. Thiagarajah's plan was to stop preterm labor with drugs and to monitor Lee for infection.  When Dr. Thiagarajah went off duty on the afternoon of September 27, 1985, Dr. Francis John Bourgeois took over as Lee's attending physician.

Around five o'clock on the evening of September 27, 1985, Dr. Julie L. Blommel, a first year resident, was notified by nurses that Lee was having contractions.  Dr. Blommel visited Lee 45 minutes later and determined that she needed to be moved across the hall to the labor and delivery room for assessment of whether she was in labor.  Around 6:45 p.m., Dr. John Donnelly, the chief resident of the high risk pregnancy service, performed a pelvic examination on Lee.  Although delivery by cesarean

section was the preferred form of delivery for Lee's condition, Lee's labor had progressed too far and a cesarean section was no longer a viable option. Therefore, Dr. Donnelly performed an emergency vaginal delivery. The baby was in a breech position and during delivery its head was entrapped when the cervix constricted upon the baby's neck and head after the delivery of the legs. In the course of the delivery, Dr. Donnelly applied traction. The baby's spinal cord was traumatically injured and she is permanently paralyzed.

The infant, Trinica Ann Lee, filed a motion for judgment by her mother and next friend, Lee, naming the Commonwealth and seven doctors, including Drs. Thiagarajah and Bourgeois as defendants, alleging that they negligently provided medical treatment to her. The plaintiff nonsuited five of the doctors and the Commonwealth. One of the remaining doctors, Dr. Bourgeois, filed a plea of sovereign immunity and a motion for summary judgment based on that plea. The trial court held that Dr. Bourgeois was entitled to sovereign immunity and dismissed Dr. Bourgeois from the case with prejudice. Dr. Thiagarajah was subsequently nonsuited. We awarded the plaintiff an appeal to review the trial court's determination that Dr. Bourgeois was entitled to sovereign immunity.

In determining whether a state employee is entitled to sovereign immunity in an action alleging acts of simple negligence, we apply the four-part test set out in James v. Jane, 221 Va. 43, 267 S.E.2d 108 (1980), and Messina v. Burden, 228 Va. 301, 321 S.E.2d 657 (1984). The four factors are: the nature of

the function performed by the employee, the extent of the state's interest and involvement in that function, the degree of control exercised by the state over the employee, and whether the alleged negligent act involved the use of judgment and discretion.  Id. at 313, 321 S.E.2d at 663.

In this case, the trial court focused its analysis on the first two factors, the function of the employee and the state's interest in that function.  These two factors have previously been addressed in the context of state-employed physicians.  In James v. Jane, we determined that three physicians employed by the Commonwealth as faculty members at the Medical School of the University of Virginia were not entitled to sovereign immunity in actions for negligence based on allegations that they failed to exercise reasonable care in attending a patient.  221 Va. at 55, 267 S.E.2d at 114.  The rationale of the decision was two-fold. First, the Commonwealth's paramount interest was that the University of Virginia operate a good medical school staffed with competent professors.  The Commonwealth's interest in quality patient care was the same whether that patient was being treated in a public teaching hospital or in a private medical institution.  Since the actions complained of related to the provision of patient care, not the educational function of the faculty members, the state's interest was slight.  Second, a physician's exercise of professional skill and judgment in treating a patient is not subject to the control of the Commonwealth.  221 Va. at 54-55, 267 S.E.2d at 114; Lohr v. Larsen, 246 Va. 81, 85-86, 431 S.E.2d 642, 644-45 (1993).

Since James v. Jane, we have considered other cases involving allegations of negligence against physicians who were employed by the Commonwealth. In Gargiulo v. Ohar, 239 Va. 209, 387 S.E.2d 787 (1990), a board-certified physician was employed by a state hospital as a fellow in a medical research and training program run by the hospital. We held the employee was entitled to immunity in an action alleging that she negligently treated a patient participating in the research program. In discussing the nature of the employee's function, we concluded that the alleged negligent acts were performed by the employee in her capacity as a student which was a function "essential to achievement of the Commonwealth's goal . . . of training and maintaining a pool of specialists skilled in a particular discipline." Id. at 213, 387 S.E.2d at 790.

Subsequently in Lohr, we concluded that a physician treating a patient for breast cancer in a public health clinic was entitled to sovereign immunity for alleged acts of simple negligence. Analyzing the function of the physician employee and the state's interest, we concluded that treating the patient was "an essential part of the clinic's delivery of its health care services" and that the state had a substantial interest in providing quality medical care for citizens in certain areas of the state who are economically unable to secure such services from the private sector. 246 Va. at 86, 431 S.E.2d at 644-45.

In analyzing the employee's function and the Commonwealth's interest and involvement in that function in this case, the trial court found that Dr. Bourgeois' function at the time of the

alleged negligent acts was to be "available for consultation by any member of the obstetrical house staff." Because no member of the house staff consulted Dr. Bourgeois concerning Lee's pregnancy and delivery and he had no other personal contact with her, the trial court concluded that Dr. Bourgeois' function was that of "a teacher and consultant to residents, as opposed to a treating physician administering medical care to patients."  The trial court held that in this role Dr. Bourgeois was furthering the paramount interest of the University Hospital as set out in James v. Jane, that is, operating a good medical school staffed with competent professors.

Our review of the record, however, indicates that Dr. Bourgeois' function at the time of the alleged negligent acts was more than simply being available to consult with residents or other members of the obstetrical staff.  In his role as attending physician, his primary function related to the treatment of patients and is analogous to that of Dr. Hakala, the attending physician in James v. Jane.  We conclude that Dr. Bourgeois, like Dr. Hakala, is not entitled to sovereign immunity under the circumstances of this case.

The physicians at the University Hospital are divided into two categories.  The "house staff" category includes interns, residents, and fellows.  The house staff does not have hospital admitting privileges.  The "medical staff" category is comprised of fully-licensed physicians who have completed their training and are full-time faculty members in the Department of the School of Medicine.  The medical staff supervises the house staff.

The University Hospital requires that all patients in the hospital be assigned an attending physician who is a member of the medical staff.  The attending physician is responsible for determining a treatment plan for the patient and for making decisions regarding the medical care of the patient.  The attending physician is also responsible for supervising the patient care administered by the house staff.  The house staff may not undertake certain procedures, such as performing a delivery by cesarean section, without consulting the attending physician.

If the attending physician for a patient goes off duty, another member of the medical staff of the hospital must be designated as the attending physician for that patient.  The subsequent attending physician has the same responsibilities regarding the medical care of the patient as the previous attending physician.[*]

In this case, Lee arrived at the emergency room with pregnancy complications.  Dr. Allen Hogge admitted her to the high risk pregnancy service and later Dr. Thiagarajah became her attending physician.  Both Dr. Hogge and Dr. Thiagarajah were members of the medical staff and the Maternal Fetal Medicine division of the Department of Obstetrics and Gynecology at the University Medical School.  Dr. Thiagarajah devised a treatment

_____

[*]The trial court and Dr. Bourgeois refer to the doctor's role as an "on call attending" or an "on call faculty member."  These terms are not defined in the record and the record speaks only of an "attending physician" in terms of the requirements for patient care.

management plan for Lee.  Dr. Thiagarajah and various interns and residents, under Dr. Thiagarajah's supervision and direction, attended to the care of Lee.

On September 27th, Dr. Bourgeois became the attending physician for Dr. Thiagarajah's patients.  As part of the transfer of patients from one attending physician to another, Dr. Thiagarajah reviewed the condition and status of his patients with Dr. Bourgeois.  According to Dr. Bourgeois, the patients were not identified by name, but their conditions were summarized in general categories.  In accepting this assignment as attending physician, Dr. Bourgeois testified that he assumed the same responsibilities for Lee's care as those borne by Dr. Thiagarajah.  He acknowledged that, as attending physician, he became responsible for making the final decisions on Lee's care. He could examine Lee, review her chart, change Dr. Thiagarajah's treatment plan, and alter instructions to the residents regarding notification of labor or the method of delivery.  As attending physician, Dr. Bourgeois was also obligated to respond to inquires from the residents regarding the care of the patients.

As the trial court noted, the role of the attending physician includes teaching responsibilities, particularly when responding to questions raised by residents or other members of the house staff.  However, the hospital policy requiring an attending physician for each patient at all times is not primarily directed to the goal of good teaching practices, but to insuring that patients receive competent care.  Furthermore, the General Assembly has required that all persons in the category of

house staff be responsible and accountable to a licensed member of the hospital staff.  Code §§ 54.1-2960, -2961.  The care of the patient could not be, and was not, left solely to the house staff.  Thus, the function of Dr. Bourgeois as attending physician was directly related to assuring that the patient, in this case Lee, received the proper care, whether delivered directly by him or indirectly through a member of the house staff.

The trial court and Dr. Bourgeois put significant emphasis on the fact that Dr. Bourgeois did not engage in any direct treatment of Lee and was not consulted by a member of the house staff regarding her treatment.  The argument that the absence of action by the attending physician or the failure of a resident to call on the attending physician makes the attending physician's function solely a teaching function is not persuasive.  Dr. Bourgeois accepted Lee as a patient for whose care he was responsible when he agreed to replace Dr. Thiagarajah as Lee's attending physician.  Dr. Bourgeois used his professional medical judgment when he determined that the medical treatment plan devised for Lee by Dr. Thiagarajah was proper and would remain in place during Dr. Bourgeois' time as attending physician.  As noted above, Dr. Bourgeois also used his professional judgment regarding Lee's treatment when he decided that he did not need to examine her or her charts or engage in any other clinical evaluation of her at the time he became her attending physician.  The responsibility of an attending physician and the decisions incumbent upon one in that position are directly aimed at

insuring quality care for the patient.  While the acts which Dr. Bourgeois did, or did not do, may be relevant to issues of liability, his acts or omissions are not dispositive on the issue of sovereign immunity in this case.

The only difference between Dr. Bourgeois and Dr. Hakala, an attending physician in James v. Jane, is that Dr. Hakala was consulted as to the need for surgery and was present in the room while the surgery was performed by another.  221 Va. at 49, 267 S.E.2d at 111.  Dr. Hakala did not render any direct treatment to the patient.  Nevertheless, we held he was not entitled to sovereign immunity because the alleged acts of negligence occurred as part of patient care, not as part of maintaining a good medical school, and the acts involved the exercise of professional medical judgment, a function beyond the control of the Commonwealth.  Id. at 54-55, 267 S.E.2d at 114.

Because we find that Dr. Bourgeois' function as an attending physician in this case was related to patient care and that acts taken regarding patient care are within the professional medical judgment of the physician, we conclude that the state's interest and degree of involvement are slight.  Id.  Therefore, Dr. Bourgeois is not entitled to sovereign immunity for the alleged negligent acts raised in this action.

Accordingly, the judgment of the trial court will be reversed and the case remanded for further proceedings.

Reversed and remanded.