## Patricia Gargiulo

### v.

## Jill Ann Ohar, M.D.

Record No. 881291

January 12, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting and Lacy, JJ., and Poff, Senior Justice

*Christopher J. Habenicht (Rudolph L. Di Trapano; Lonnie C. Simmons; Melissa M. Hambrick; Hopson & Habenicht; Di Trapano & Jackson,* on brief), for appellant.

*Thomas E. Spahn (Rosewell Page, III; Joseph P. McMenamin; McGuire, Woods, Battle & Boothe,* on brief), for appellee.

*Amicus Curiae:* Commonwealth of Virginia (Mary Sue Terry, Attorney General; Gail Starling Marshall, Deputy Attorney General; Guy W. Horsley, Jr., Senior Assistant Attorney General), for appellee.

SENIOR JUSTICE POFF delivered the opinion of the Court.

We granted this appeal to consider whether, as the trial court ruled, a licensed, board-certified physician, a salaried employee of a state hospital engaged as a fellow in a medical research and training program conducted by the hospital, was entitled to sovereign immunity from liability for medical malpractice allegedly committed against a patient participating in the program.

The question arises out of a judgment sustaining a defense motion to dismiss a motion for judgment filed by Mrs. Patricia Gargiulo against Dr. Jill Ann Ohar and certain others who were later dismissed as parties. The judgment was entered following a hearing at which the trial court heard testimony, examined exhibits and affidavits introduced by the parties, and considered legal

memoranda and arguments of counsel. The facts, drawn from the record of that hearing, are not in dispute.

Mrs. Gargiulo, a registered nurse, suffers from progressive systemic sclerosis or scleroderma. Scleroderma is a chronic disease of the connective tissues. Victims of the disease often experience pulmonary hypertension and malfunction of the cardiovascular system.

Virginia Commonwealth University, formally "classified" as one of several "governmental instrumentalities" by Code § 23-14 and "established" as a state "corporation" by § 23-50.5, is "empowered" by § 23-50.7 "to maintain and conduct hospitals, infirmaries, dispensaries, laboratories, [and] research centers . . . ." One such facility is "designated The Medical College of Virginia, Health Sciences Division of Virginia Commonwealth University (MCV)." *Id.*

Dr. Alpha A. Fowler, a member of the faculty and attending physician at MCV, prepared a protocol for a research and training project to study scleroderma. The protocol specified uniform procedures for diagnosis and treatment of participating patients. By assessing the effects of two drugs, nitroglycerin and nifedipine, on respiratory and cardiovascular problems, the study, the first of its kind, was an effort to discover means of reducing the incidence and the severity of pulmonary hypertension and prolonging survival of its victims. The Committee on the Conduct of Human Research at MCV approved the protocol and funding of the project.

Dr. Jill Ann Ohar, a 1977 graduate of the Medical College of Pennsylvania, served until 1979 as an intern at that facility and, until 1981, as a resident at MCV. As a licensed physician, board-certified in internal medicine, she was awarded a six-year fellowship in the research project. In the second year of the fellowship, Mrs. Gargiulo, who had volunteered to participate as a patient in the project, was assigned to the care of Dr. Ohar.

Working under Dr. Fowler's supervision, Dr. Ohar administered drugs to Mrs. Gargiulo and performed a variety of tests prescribed by the protocol. One such test required the insertion of a heart catheter. According to the motion for judgment, the catheter was negligently secured and became disconnected, "causing Mrs. Gargiulo to suffer . . . an air embolism which rendered Mrs. Gargiulo comatose and caused her severe and permanent inju-

ries". Other facts bearing upon the sovereign-immunity issue will be detailed in the course of our opinion.

## I.

Preliminarily, Mrs. Gargiulo "respectfully submits that the abolition of this ancient doctrine would avoid cumbersome and uncertain analysis that is used in determining the sovereign immunity issue and would result in more uniform decisions by the trial courts in this state." Considering the "multitude of purposes" served by the doctrine as summarized in *Messina v. Burden*, 228 Va. 301, 308, 321 S.E.2d 657, 660 (1984), and absent any relevant legislative change, we reaffirm our conclusion that "the doctrine of sovereign immunity is 'alive and well' in Virginia." *Id.* at 307, 321 S.E.2d at 660.

## II.

As stated by Mrs. Gargiulo, "[t]he precise legal issue presented in this case is whether Defendant should be held liable for her negligent acts under *James v. Jane*, 221 Va. 43, 282 S.E.2d 864 (1980), or whether she should be entitled to sovereign immunity under *Lawhorne v. Harlan*, 214 Va. 405, 200 S.E.2d 569 (1973), *overruled on other grounds, First Virginia Bank-Colonial* v. *Baker*, 225 Va. 72, 301 S.E.2d 8 (1983)."

In *Lawhorne*, we held that a surgical intern engaged in a postdoctoral course of training at a state hospital was immune from liability for simple negligence. In *James,* we held that attending physicians on the faculty of the University of Virginia Medical School were not immune. There, we fashioned a four-part test for determining whether a state employee charged with simple negligence is entitled to the immunity accorded the sovereign.

Under such circumstances we examine the function [the] employee was performing and the extent of the state's interest and involvement in that function. Whether the act performed involves the use of judgment and discretion is a consideration, but it is not always determinative . . . . Of equal importance is the degree of control and direction exercised by the state over the employee whose negligence is involved.

221 Va. at 53, 282 S.E.2d at 869.

In *James*, the facts failed to satisfy the test. Applying the test in three later cases, however, we held in each that the employee was immune. *Bowers* v. *Commonwealth*, 225 Va. 245, 302 S.E.2d 511 (1983) (resident engineer employed by Commonwealth); *Messina* v. *Burden, supra* (state college employee and county employee); *Lentz* v. *Morris*, 236 Va. 78, 372 S.E.2d 608 (1988) (public high school employee). We now apply the test in the case at bar.

## III.

Addressing the first two parts of the test, we consider the nature of the function performed by the employee and the extent of the state's interest and involvement in that function. Comparisons are instructive.

Dr. Ohar's role was wholly unlike that performed by the defendants in *James*. There, the defendants were members of the faculty of a state medical school and doctors serving in the state hospital, but their relationship with the plaintiff was that of physician-patient. Indeed, as we noted in *Bowers*, 225 Va. at 252, 302 S.E.2d at 515, "they were essentially private practitioners", or, as we characterized them in *Messina*, 228 Va. at 312, 321 S.E.2d at 663, "independent contractors". As such, they were performing much the same function as attending physicians at private hospitals.

By comparison, Dr. Ohar's function was to assist as an employee and student in the conduct of a basic medical research program. That program was devised, sponsored, directed, and funded by state entities pursuant to authority expressly conferred by the General Assembly. It is true, as Mrs. Gargiulo says, that Dr. Ohar was pursuing a course of education which would elevate her own professional standing and enhance her earnings potential. The same was true of the intern in *Lawhorne*. Yet, the student function is essential to achievement of the Commonwealth's goal, one undertaken in the public interest, of training and maintaining a pool of specialists skilled in a particular discipline.

## IV.

The third element of the *James* test, "not always determinative", is whether the employee was performing judgmental rather than ministerial duties. In the performance of her duties as a fel-

low in the pulmonary medicine study program, Dr. Ohar was required to make multiple professional judgments, albeit subject to review by physicians on the faculty or medical staff at MCV. As provided in the protocol, those who volunteered to participate as patients were required to "undergo complete physical examination" and were to be "excluded . . . if a significant amount of pulmonary fibrosis is judged to be evident" or when there is "evidence of flow limitation on routine spirometry". The protocol prescribed a series of tests to be administered, evaluated, and documented by the pulmonary fellows. Included was a "pretreatment right heart catheterization", the results of which were to be used to calculate "[p]eripheral and systemic vascular resistances". In phase two of the study, the fellows were required to judge "by patient weight" the "[d]osages of the medication to be administered".

■ Manifestly, Dr. Ohar, like the intern in *Lawhorne,* was "vested with and required to exercise discretion and judgment in connection with those persons who presented themselves as patients". 214 Va. at 408, 200 S.E.2d at 572.

## V.

We turn now to the fourth element of the test. Whether a state employee is entitled to the immunity accorded the sovereign depends, in part, upon the degree of control and direction the state exercises over the employee.

The state had virtually no control over the professional conduct of the physicians in *James.* Patients had "the right to request and receive the care of a particular attending physician" and physicians had "the privilege to select the patients . . . and [were] under no obligation to accept any individual or class of persons as patients." 221 Va. at 47, 282 S.E.2d at 865-66. "[T]he attending physicians of patients [were permitted to select] the methods by which they care[d] for them." *Id.* at 48, 282 S.E.2d at 866. In the performance of the defendants' functions as attending physicians, "the means and methods used . . . [were] not subject to the control and direction of others." *Id.* at 50-51, 282 S.E.2d at 867-68. Although the hospital formulated "a schedule of fees for the various procedures performed", bills were "sent in the name of the attending physicians" who were "privileged to compromise their bills or forgive them." *Id.* at 49, 282 S.E.2d at 866. A portion of the fees paid to the hospital by private patients was "allocated to

a fund used in partial support of the attending physicians' . . . retirement program". *Id.* at 48, 282 S.E.2d at 866.

■ Aside from the fact that Dr. Ohar was a licensed, board-certified physician, her status with respect to state control and direction resembled, not that of the physicians in *James*, but that of the surgical intern in *Lawhorne*. Both Lawhorne and Ohar were state employees earning state salaries and receiving no compensation, directly or indirectly, from patients in state hospitals. Each was pursuing a course of education under the tutelage of other state employees. Neither was permitted to choose or to refuse patients. Both were required to obey state-established rules, to employ state-prescribed methods, and to follow state-standardized procedures. And, while each was entrusted with a measure of discretion in the performance of assigned duties, each functioned under the supervision and subject to the command of superiors employed by the state.

■ Having applied the four-part test enunciated in *James* to the facts of record, we uphold the trial court's conclusion that Dr. Ohar was a state employee entitled to sovereign immunity, and we will affirm the judgment entered below.

*Affirmed.*

JUSTICE STEPHENSON, with whom JUSTICE COMPTON joins, dissenting.

I respectfully dissent.

I would hold that Dr. Ohar is not entitled to sovereign immunity. Although she was employed by a state hospital and was engaged in a research project, I do not agree, as the majority finds, that Dr. Ohar's "status resembled . . . that of the surgical intern in *Lawhorne*."

The first-year intern in *Lawhorne* was not licensed to practice medicine, having completed only a portion of the licensing examinations. 214 Va. at 406, 200 S.E.2d at 571. He could practice only at the state hospital "in an approved training and instruction program under the supervision of the licensed physicians of the hospital staff." *Id.* Thus, a true physician-patient relationship did not exist in *Lawhorne*.

In the present case, however, Dr. Ohar not only was a licensed physician, protected by malpractice liability insurance, she also was "board-certified" in the specialty of internal medicine. More-

over, the record makes clear that a physician-patient relationship existed between Dr. Ohar and Mrs. Gargiulo. Indeed, Mrs. Gargiulo was not attended by any other physician.

Thus, I see little similarity between Dr. Ohar and the unlicensed intern in *Lawhorne*. In my view, Dr. Ohar more nearly resembles the licensed physician in *James*, whose relationship with James was that of physician-patient.

Granting sovereign immunity to licensed physicians discourages rather than encourages good medical practices. The Commonwealth's primary interest, however, should be to encourage a physician's best efforts on behalf of his patient.

> At the point when the physician agrees to treat or operate on a certain patient, although his employment by the [Commonwealth] makes possible the arrangement, the relationship becomes the personal and confidential one of doctor and patient, not the Commonwealth . . . and patient. The physician owes his best professional efforts on behalf of the patient, and the patient expects, and has a right to expect, the same care and attention from the physician that he would receive if he were in a private hospital and the physician in private practice. The exercise by the attending physician of his professional skill and judgment in treating his patient, and the means and methods used, from the very nature of things, are not subject to the control and direction of others. The fact that the physician may follow certain prescribed guidelines and consult with colleagues, or that a review may be conducted when a patient is injured, or when a patient dies, does not alter the professional status of the attending physician or his relationship with and obligation to his patient.

*James*, 221 Va. at 50-51, 282 S.E.2d at 867-68.

Furthermore, no compelling state interest is served by allowing Dr. Ohar to be wrapped in the cloak of sovereign immunity.

> While there may have been a time when a physician [sought employment at a state hospital] because of the cloak of immunity afforded him as an employee of the sovereign state, we think that time is past. We cannot conceive of any physician, regardless of his status, practicing medicine in this era without the protection of liability insurance, which he purchases for himself or which is provided for him by his

employer. Realistically, the only interest the state has in affording immunity to the physicians practicing in state hospitals is the probability of an increase in the cost of medical malpractice insurance if such immunity is denied. We do not find this to be such a compelling state interest as to justify the denial of a patient the right to assert a claim against a physician for negligent treatment.

*James*, 221 Va. at 54, 282 S.E.2d at 870.

Mrs. Gargiulo alleges that Dr. Ohar was negligent in failing to secure a catheter properly — a routine medical procedure. As a result, the catheter disconnected and Mrs. Gargiulo suffered severe and permanent brain injury.

If the evidence would have established that Dr. Ohar violated the applicable standard of care, she should have been required to answer to Mrs. Gargiulo in damages for the resulting injuries. The majority, I submit, places too much emphasis on the relationship that existed between Dr. Ohar and the hospital and too little emphasis on the relationship that existed between Dr. Ohar and her patient.