# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Tina Marie Carter

v.

University of Virginia
Health System et al.

July 13, 2000

Case No. CL00-09

BY JUDGE EDWARD L. HOGSHIRE

In this medical malpractice action, Defendant Gisele Claridge, M.D., has filed a Plea of Sovereign Immunity. The Court conducted an *ore tenus* evidentiary hearing on June 21, 2000, and for the reasons articulated below, the Court, having reviewed the briefs and evidence, concludes that Dr. Claridge's plea should be granted.

*Statement of the Facts*

This action arises out of an anesthesia procedure performed by Dr. Claridge on Tina Carter while she was an obstetrical patient at the University of Virginia Health Sciences Center ("UVA"). Mrs. Carter was admitted to UVA late in the evening on January 14, 1998, for the labor and delivery of her second child. She was started on Pitocin for labor augmentation around 12:30 a.m. on January 15, 1998. Around 4:00 a.m. on the morning of January 15, Dr. Claridge was paged to Mrs. Carter's room to administer epidural anesthesia for pain relief from labor as Mrs. Carter progressed towards delivery.

Since January 1998, Dr. Claridge had been a resident in the Department of Anesthesiology's residency program. In the program, residents complete a clinical base year, or internship year, which provides the resident with twelve months of broad clinical education in medical disciplines, of which a

maximum of only one month may involve the administration of anesthesia. Thereafter, the resident must complete three years of clinical anesthesiology training (CA-1 to CA-3 years) for a total of four years of post-graduate study. *See* Affidavit of Dr. Carl Lynch, III, Chair of the Department of Anesthesiology, ¶ 6. In January 1998, Dr. Claridge had completed her internship year and was in the middle of her CA-1 year. During the CA-1 and CA-2 years, as part of basic anesthesia training, residents must complete various rotations. *See id.* At the time she administered the epidural to Mrs. Carter, Dr. Claridge was on the second day of her first rotation in obstetric (OB) anesthesia.

In the first six months of her CA-1 year, Dr. Claridge participated in approximately twenty epidural procedures. *See* Dr. Claridge's log of procedures. During January 1998, while on OB rotation, she performed twenty-eight epidural procedures. *See id.* Dr. Claridge had never performed an epidural procedure during medical school or during her internship year. Pursuant to guidelines established by the Accreditation Council for Graduate Medical Education (ACGME), anesthesiology residents must perform at least forty anesthetics for obstetrical patients undergoing vaginal delivery, as well as at least fifty epidurals for patients undergoing surgical procedures, to satisfy residency training requirements. *See* Affidavit at ¶ 9.

Before starting the procedure, Dr. Claridge paged Dr. Johns, the attending anesthesiologist on duty, and discussed Mrs. Carter's case and proposed plan of treatment. Dr. Claridge then entered Mrs. Carter's room and discussed the procedure with Mrs. Carter and her husband. Dr. Claridge described the risks of the procedure and obtained consent. Before beginning the procedure, Dr. Johns arrived in Mrs. Carter's room to supervise Dr. Claridge.

Dr. Johns remained in Mrs. Carter's room to supervise the procedure up until the time Dr. Claridge began the insertion of the epidural needle. At that time, Dr. Johns was paged to the OR for trauma surgery. Dr. Claridge encountered bony resistance after inserting the needle. After trying twice to redirect the needle, she then threaded the epidural catheter through the needle to advance the catheter into the epidural space. While introducing the catheter, Dr. Claridge met with positive resistance and could not fully advance the catheter. She had never before encountered this problem. After she removed the catheter, she noted that the tip had sheared off and presumably remained in the epidural space. Dr. Claridge had Dr. Johns paged to Mrs. Carter's room to manage the complication.

*Discussion*

The Virginia Supreme Court has decided five sovereign immunity cases involving physicians employed by the Commonwealth. In all five cases, the physicians were providing patient care at the time of the alleged negligent acts. In two cases, the court granted sovereign immunity to student physicians who were providing care as part of their training. *See Lawhorne v. Harlan*, 214 Va. 405 (1973); *Gargiulo v. Ohar*, 239 Va. 209 (1990). In the third case, the court granted sovereign immunity to a physician providing care in the public health system. *Lohr v. Larsen*, 246 Va. 81 (1993). In two cases, the Virginia Supreme Court has denied sovereign immunity to *attending* physicians, not acting in their teaching function. *See James v. Jane*, 221 Va. 43 (1980); *Lee v. Bourgeois*, 252 Va. 328 (1996). In *James*, the court articulated the following four-part test to determine when employees of the Commonwealth are entitled to sovereign immunity:

(1) The nature of the function performed by the employee;

(2) The extent of the state's interest and involvement in that function;

(3) The degree of control and direction exercised by the state over the employee; and

(4) Whether the act complained of involved the use of judgment and discretion.

221 Va. at 53.

The Plaintiff concedes that Dr. Claridge has met the requirements of the third and fourth factors of the *James* test, but argues that Dr. Claridge cannot satisfy the first and second elements. Plaintiff contends that Dr. Claridge is unable to meet the first element of the *James* test because, in treating Mrs. Carter, she was functioning as an attending physician. In respect to the second element, Plaintiff claims that Dr. Claridge's alleged negligence arose while functioning primarily as a patient care provider rather than a student engaged in anesthesiology training. Therefore, Plaintiff argues that while the Commonwealth does have a significant interest in educating physicians, the State's interest in the treatment of a specific patient is slight.

The Court finds that Dr. Claridge does, in fact, satisfy all four requirements of the *James* test. Hereinafter, the Court will discuss its decisions regarding the first two contested factors.

*Nature of the Function Performed by Dr. Claridge*

Addressing the first element, although Dr. Claridge was engaged in patient care, she was clearly performing Mrs. Carter's epidural procedure as an integral part of her residency training program. Dr. Claridge's care of Mrs. Carter provided Dr. Claridge with practical experience and advanced her towards completion of the ninety required epidurals for board certification. The most persuasive factor indicating that Dr. Claridge was acting in her student capacity was the required presence of an attending physician to supervise the procedure, barring extenuating circumstances. As a student physician providing patient care, before proceeding, Dr. Claridge was required to, and did, first discuss Mrs. Carter's treatment plan with Dr. Johns. As expected, Dr. Johns accompanied Dr. Claridge to oversee the procedure. Dr. Johns would have been present to supervise the entire procedure had he not been paged to an emergency surgery. . . .

The Court's application of the first factor to Dr. Claridge's plea is consistent with this Court's holding in *Lilly v. Brink*, 51 Va. Cir. 444 (2000). In *Lilly*, the Court relied on *Lee*, 252 Va. at 332-34, to deny sovereign immunity to a second year resident physician. In finding that the resident was functioning more as an attending physician than a student, the Court emphasized that the attending physician did not discuss treatment with the resident prior to caring for the patient, nor did he supervise the resident during treatment. *See Lilly, supra.* The attending physician's only supervision of the resident consisted of reviewing the resident's treatment notes once the patient had been dismissed. *See id.* In Dr. Claridge's situation, however, Dr. Johns discussed a plan of treatment with her and was expected to remain to supervise the procedure.

The Court's opinion is also influenced by the fact that Dr. Claridge was relatively inexperienced in performing epidurals, having performed less than a quarter of the procedures required to become board eligible. Dr. Claridge had never before encountered resistance when attempting to insert an epidural, as she did with Mrs. Carter. These factors further distinguish this case from *Lilly*, where the resident performed a basic physical exam and assessed patient complaints, skills both of which had been learned in medical school prior to residency. *Supra.* Unlike the doctor in *Lilly*, Dr. Claridge was in the process of learning a new procedure, she was not applying expertise that she had learned previously.

Based on the above-stated factors, the Court concludes that, when Dr. Claridge treated Mrs. Carter, she was providing care as part of her training as a student physician; she was not functioning as an attending physician. As

such, the first element weighs in favor of Dr. Claridge's plea for sovereign immunity.

### The Extent of the State's Interest and Involvement in That Function Performed by Dr. Claridge

The factor of the state's interest and involvement in the employee's function is intertwined with the previous factor, the nature of the employee's function. The Court has determined that Dr. Claridge treated Mrs. Carter as an integral part of her clinical training. The Virginia Supreme Court has held that the Commonwealth has a significant interest in "training and maintaining a pool of specialists skilled in a particular discipline." *Gargiulo*, 239 Va. at 213. Thus, Dr. Claridge's care of Mrs. Carter was performed in furtherance of the Commonwealth's interest in cultivating a pool of anesthesiology specialists. Though Dr. Claridge was providing patient care, her level of experience, the requirement of direct supervision barring extenuating circumstances, and the necessary performance of a requisite number of such procedures for board eligibility, all indicate that Dr. Claridge was providing patient care for its inherent training and educational component.

In addition, the Commonwealth was involved in Dr. Claridge's daily operations. Dr. Claridge was employed and paid by the Commonwealth. *See Lawhorne*, 214 Va. at 408. The Commonwealth determined her schedule and where she worked. She did not pick and choose her patients, nor could she bill them directly. Dr. Claridge was required to use state provided equipment. Therefore, based on the Commonwealth's interest in training physicians in specialties and the Commonwealth's substantial involvement in Dr. Claridge's practice, the second factor weighs in favor of granting Dr. Claridge's plea.

### Conclusion

In conclusion, Dr. Claridge has satisfied all four factors of the *James* analysis. Accordingly, for the above-stated reasons, the Court grants her Plea for Sovereign Immunity.