# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Krystel Hey

    v.

University of Virginia
Health Services Foundation et al.

May 24, 2010

Case No. 09-74

BY JUDGE EDWARD L. HOGSHIRE

In this medical malpractice action, Defendants Benjamin T. Isbell, M.D., and Erica Werner, M.D., licensed resident physicians, have jointly filed a Special Plea of Sovereign Immunity. For the reasons set forth below, Defendants' Plea will be granted.

*Facts*

The Plaintiff, Krystel Hey, alleges that Defendants Dr. Isbell and Dr. Werner along with the attending physician, Dr. Christian Chisholm were negligent in their treatment and care of her when she was admitted to the University of Virginia ("UVA") Medical Center for induction of labor and planned vaginal delivery during her second pregnancy. Ms. Hey alleges that the Defendants deviated from the standard of care in a variety of ways, including failing to estimate fetal weight properly, failing to perform a Caesarean section instead of attempting vaginal delivery, and failing to manage fetal shoulder dystocia when it occurred, resulting in physical and emotional injury to Ms. Hey and the death of her child due to asphyxia. Defendants, Isbell and Werner, licensed physicians in the residency training program in Obstetrics and Gynecology ("OB/GYN") at

the University of Virginia, have responded with a joint Special Plea of Sovereign Immunity. Depositions were taken, and, during an *ore tenus* hearing on February 22, 2010, the Court heard evidence and argument and took the matter under advisement.

The conduct at issue for the purposes of the Special Plea involves Ms. Hey's admission to UVA Medical Center for scheduled induction on June 16, 2007. Her treatment team consisted of Dr. Isbell, a third year resident, Dr. Werner, chief resident, and Dr. Chisholm. (Hr'g Tr. 45-46, Feb. 22, 2010.) At the time Ms. Hey presented, Dr. Isbell had completed two years of residency training and held a limited license to practice medicine under the supervision of an attending physician as part of the UVA Medical Center's residency program. (Hr'g Tr. 40-41.) Dr. Werner had just completed her third year of residency and had begun the first day of her fourth year, her chief resident year. (Hr'g Tr. 82.)

Dr. Isbell performed the initial examination of Ms. Hey at approximately 6:15 p.m. (Hr'g Tr. 48.) During the initial examination, Dr. Isbell performed an ultrasound to determine the positioning of the fetus and estimated fetal weight at 8½ pounds by performing Leopold's Maneuvers. (Hr'g Tr. 53-54). Dr. Isbell did not perform an ultrasound to evaluate fetal weight. (Hr'g Tr. 71.)

Dr. Chisholm followed Dr. Isbell and performed his own evaluation of the patient approximately two hours after the initial physical examination. (Chisholm Dep. Tr. 28; Hr'g Tr. at 73.) At that time, Dr. Chisholm reviewed Dr. Isbell's proposed treatment plan and noted his agreement with it. (Hr'g Tr. 49, 51; Chisholm Dep. Tr. 20-21.) Dr. Chisholm also assessed the size of the fetus during his examination, using Leopold's Maneuvers, and noted his estimate at 8 to 8½ pounds. (Hr'g Tr. 54; Chisholm Dep. Tr. 21-22.) The note is timed 8:30 p.m. (Def.'s Ex. 2; Chisholm Dep. Tr. 19.)

From the time Dr. Chisholm conducted his evaluation of Ms. Hey at approximately 8:30 p.m. until she began pushing in the final stages of labor after 11:00 p.m., it is unclear how much and to what extent Dr. Chisholm was physically present and provided additional instruction when care was dispensed to Ms. Hey. (Hr'g Tr. 114, 125.) In that period, Drs. Isbell and Werner followed the treatment plan approved by Dr. Chisholm. (Hr'g Tr. 55.) They performed such functions as interpreting fetal heart monitoring strips, starting and stopping Pitocin per unit protocol, placing and removing fetal scalp electrodes, assessing Ms. Hey's cervix, rupturing her membranes, and instructing Ms. Hey to begin pushing. (Hr'g Tr. 55-56, 58, 65, 100-02; Chisholm Dep. Tr. 31-32, 34-35.) It is also unclear

whether or when Dr. Chisholm was notified of two episodes of fetal heart rate decelerations that occurred during the progression of Ms. Hey's labor at approximately 9:50 p.m. and 10:25 p.m. (Hr'g Tr. 56, 102-03; Chisholm Dep. Tr. 36-37.) Dr. Chisholm was informed and called to Ms. Hey's room during an eight-minute prolonged deceleration that occurred just prior to Ms. Hey's delivery at approximately 10:46 p.m. (Hr'g Tr. at 102, 104; Chisholm Dep. Tr. 43-44.)

Dr. Chisholm was also present when Ms. Hey began pushing at approximately 10:51 p.m. and during hands on delivery of the child. (Hr'g Tr. 58-59; Chisholm Dep. Tr. 48-50.) Dr. Isbell performed Ritgen's maneuver in an attempt to deliver the baby's head and expedite delivery. (Hr'g Tr. 59-60.) Dr. Chisholm was present and agreed with Dr. Isbell's decision to perform the maneuver. (Hr'g Tr. 61, 93.) There are no allegations of negligence on the part of the resident physicians after the Ritgen's maneuver. (Hr'g Tr. 119, 123.) When delivery of the child did not progress past delivery of the head, it was discovered that the baby had experienced shoulder dystocia. (Hr'g Tr. 62; Chisholm Dep. Tr. 57.) Dr. Isbell continued to attempt delivery of the child with Dr. Chisholm applying suprapubic pressure. (Hr'g Tr. 62; Chisholm Dep. Tr. 57-58.) Dr. Werner then replaced Dr. Isbell at the perineum followed by Dr. Chisholm. (Hr'g Tr. 62-63, 93-94; Chisholm Dep. Tr. 58-60.) Dr. Chisholm was ultimately successful in delivering the baby, but the child had died. (Chisholm Dep. Tr. 65-66.)

The following additional facts set forth in the record are relevant. Only an attending physician has the authority to order a Caesarean section. (Hr'g Tr. 25.) Prior attending approval is required to start administering Pitocin. (Hr'g Tr. 29-30). At UVA, Pitocin is administered according to a pre-established per unit protocol, with allows for discretion in administering the drug based on the labor pattern. (Hr'g Tr. 73, 103.) Residents in the OB/GYN program at the University of Virginia Medical Center have no control over the number and identity of the patients they serve or the amount charged for their services, and their salaries are not dependent on the number of patients they see or the types of procedures performed. (Hr'g Tr. 25.)

*Issue Presented*

Whether the Defendants, licensed physicians in the residency training program at UVA Medical Center, are entitled to sovereign immunity from liability for medical malpractice related to care they

dispensed under the general supervision and direction of an attending physician when the attending physician was not physically present at all times the Defendants provided care to the patient.

*Analysis*

Sovereign immunity attaches to protect an employee of the Commonwealth from liability for negligence only when that employee satisfies all four elements of the *James v. Jane* test:

1. The nature and function performed by the employee;
2. The extent of the State's interest and involvement in that function;
3. The degree of control and direction exercised by the State over the employee;
4. Whether the act complained of involved the use of judgment and discretion.

*James v. Jane*, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980); *Messina v. Burden*, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984). Immunity must be denied if all four factors are not met.

*1. Nature and Function Performed by the Employee; Commonwealth's Interest and Involvement Therein*

For the purposes of analysis, factors one and two of the *James v. Jane* test will be combined, as the two are closely related and interdependent. As the Supreme Court of Virginia stated in *Lohr v. Larsen*, 246 Va. 81, 85-86, 431 S.E.2d 642, 644-45 (1993), if the function the government employee was negligently performing was essential to a government objective, and the government had a great interest in that function, this weighs in favor of a defendant's sovereign immunity. By contrast, if the employee's function has only a marginal influence upon a governmental objective and the government's interest is slight, this weighs against sovereign immunity. *Id.*

In this case, the Plaintiff asserts that the Defendants served the primary function of providing patient care in that their treatment of Ms. Hey was more analogous to that of practicing doctors than students. Further, the Plaintiff argues, the Commonwealth has little interest in individual patient care as provided at the University of Virginia Medical

Center. *See James v. Jane*, 221 Va. at 54, 282 S.E.2d at 870. By contrast, the Defendants argue that they treated Ms. Hey in order to further their education and training and thus were performing a student function. As students, the Defendants argue, they were performing an essential function in furtherance of the Commonwealth's paramount interest in "training and maintaining a pool of specialists skilled in a particular discipline." *Gargiulo v. Ohar*, 239 Va. 209, 213, 387 S.E.2d 787, 790 (1990).

The Commonwealth of Virginia has a strong and well-recognized interest in the training of resident physicians, such as Drs. Isbell and Werner, in medical specialties, including obstetrics and gynecology. In *James*, 221 Va. at 54, 282 S.E.2d at 870, the Supreme Court of Virginia first articulated this distinction between the Commonwealth's general interest in proper medical care and its more specific interest, in its sovereign capacity, in education and training at the University of Virginia Medical Center:

> [T]he paramount interest of the Commonwealth of Virginia is that the University of Virginia operate a good medical school and that it be staffed with efficient and competent administrators and professors. The state is of course interested and concerned that patients who are treated at the University Hospital receive proper medical care. However, the state has this same concern for every patient who is treated in any private hospital or by any doctor throughout the Commonwealth. This is evidenced by the numerous statutes enacted by the General Assembly of Virginia designed to assure adequate medical care and medical facilities for the people of the state. The state's interest and the state's involvement, in its sovereign capacity, in the treatment of a specific patient by an attending physician in the University Hospital are *slight*; equally slight is the control exercised by the state over the physician in the treatment accorded that patient.

*Id.* (emphasis added); *see also Gargiulo*, 239 Va. at 213, 387 S.E.2d at 790 ("[T]he student function is essential to achievement of the Commonwealth's goal, one undertaken in the public interest, of training and maintaining a pool of specialists skilled in a particular discipline."); *Carter v. University of Va. Health Sys.*, 52 Va. Cir. 416 (Charlottesville 2000) (holding that an anesthesiology resident in her second year of

postdoctoral training was acting in a student capacity in providing patient care and was thus entitled to sovereign immunity). *But cf. Lilly v. Brink*, 51 Va. Cir. 444 (Orange County 2000) (denying a second-year resident sovereign immunity where the resident did not discuss the course of treatment with the attending physician prior to the patient's discharge and the attending physician did not supervise the resident during treatment).

In *James*, the Supreme Court of Virginia denied sovereign immunity to UVA medical school faculty who also served as attending physicians at the UVA hospital. In doing so, the Court distinguished its holding in *James* from that in *Lawhorne v. Harlan*, 214 Va. 405, 200 S.E.2d 569 (1973), overruled on other grounds by *First Virginia Bank-Colonial v. Baker*, 225 Va. 72, 301 S.E.2d 8 (1983), where the Court held that a surgical intern engaged in postdoctoral training at the University of Virginia Hospital was immune from liability for simple negligence. Unlike the *James* defendants, the surgical intern in *Lawhorne* "was, because of his inexperience, closely controlled, supervised, and directed by his employer," and therefore entitled to the immunity of the sovereign. *James*, 221 Va. at 54, 282 S.E.2d at 869.

In this case, because the Defendants were acting in a student or training capacity in providing patient care under the direct supervision of an attending physician, this Court agrees that they are immune. The status of the Defendants at the time treatment was dispensed resembled not that of the attending physicians in *James*, but that of the surgical intern in *Lawhorne*. *See Gargiulo*, 239 Va. at 215, 387 S.E.2d at 791.

Although Plaintiff argues to the contrary, this case is distinguishable from the minimal involvement of the attending physician in *Spencer-Jones v. Bourgeois*, Case No. 00-83 (Charlottesville Cir. Ct., letter opinion dated Aug. 7, 2003). (Pl.'s Ex. 4.) In this case, Dr. Chisholm was physically present to examine Ms. Hey and approve a treatment plan proposed by Drs. Isbell and Werner. Though Dr. Chisholm was not physically present when care was dispensed to Ms. Hey during all stages of labor, the residents followed and implemented the treatment plan approved by Dr. Chisholm and administered medications to speed delivery pursuant to the treatment plan and hospital protocol. Dr. Chisholm was also informed of a prolonged deceleration prior to Ms. Hey's delivery and was called to the patient's room during the deceleration. Only Dr. Chisholm could have ordered delivery by Caesarean section, and he approved the decision to have Ms. Hey deliver by induction. Furthermore, Dr. Chisholm was physically present in the delivery room at the critical stage of Ms. Hey's labor when she began delivery and approved the

maneuvers employed by Drs. Isbell and Werner to deliver the child under his supervision.

This Court has never held that side-by-side guidance and instruction is required for sovereign immunity to attach. It is clear that the resident physicians in this case, both of whom were pursuing a course of education under the tutelage of experienced physicians at UVA Medical Center, were closely controlled and directly supervised by their attending physician. As the Supreme Court of Virginia stated in *Gargiulo*, 239 Va. at 215, 387 S.E.2d at 791, "[W]hile each [of the Defendants] was entrusted with a measure of discretion in the performance of assigned duties, each functioned under the supervision and subject to the command of superiors employed by the state." Each of the Defendants specifically relied on the instruction and direction of Dr. Chisholm in developing a course of treatment for Ms. Hey, and they sought his guidance and approval at critical stages of Ms. Hey's labor and delivery. In short, Drs. Isbell and Werner were closely controlled by Dr. Chisholm even as they exercised discretion in the performance of their duties; therefore, they performed a student or training function in their treatment of Ms. Hey. Given the Commonwealth's recognized interest in medical education and training of resident physicians, these facts compel the conclusion that the first two *James* factors are met.

## 2. *Degree of Control and Direction Exercised by the Commonwealth over the Employee*

The Plaintiff concedes that the Commonwealth exercised a sufficient degree of direction and control over the Defendants' conduct. (Pl. Mem. in Opp'n to Defs. Special Plea 8.)

## 3. *Employee's Use of Judgment and Discretion*

The Plaintiff concedes that the Defendants conduct at issue involved the exercise of judgment and discretion. (Pl. Mem. in Opp'n to Defs.' Special Plea 8.)

### *Conclusion*

In conclusion, because the Defendants have satisfied all four prongs of the *James v. Jane* test, the Defendants' Plea of Sovereign Immunity should be granted.