# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Stephanie A. Roush
and Jason C. Roush,
Administrators
of the Estate of
Trenton Curry Roush,
deceased

    v.

James C. West et al.

October 5, 2011

Case No. 2010-239

By Judge Edward L. Hogshire

This medical malpractice action arose from the purportedly negligent acts of Defendants David S. Lim, M.D., James C. West, M.D., and Sandra S. Dean, R.N., which allegedly led to the wrongful death of Trenton Curry Roush. The issues presented here are Dr. West's and Nurse Dean's special pleas of sovereign immunity. "A plea of sovereign immunity is a defensive plea presenting distinct issues of fact which, if proved, create a bar to the plaintiff's right of recovery." *Whitley v. Commonwealth*, 260 Va. 482, 493, 538 S.E.2d 296, 302 (2000). As the moving parties, Defendants bear the burden of proving those issues of fact. *Id.* Having carefully considered the arguments of counsel at the June 24, 2011, *ore tenus* hearing, as well as the pleadings, legal memoranda, and exhibits introduced by the parties, the Court, for the reasons set forth below, will deny Nurse Dean's plea of sovereign immunity but will grant the plea asserted by Dr. West.

*Summary of the Facts*

On the evening of August 20, 2009, Trenton Curry Roush, a four-and-half month old infant born with congenital cardiac abnormalities, was transferred from Winchester Medical Center to UVA Children's Hospital for observation and monitoring after being electrically cardioverted out of a rapid heart rate. (Hr'g Tr. at 14, 18.) Trenton was brought to UVA due to his condition because he was a patient of UVA's pediatric cardiology practice and because UVA is the highest level pediatric cardiology center in the area. (Hr'g Tr. at 16.) In fact, UVA Children's Hospital is the only single ventricle cardiology center in the Commonwealth with a pediatric heart surgeon and pediatric cardiology subspecialists. (*Id.* 15-17, 19.) At UVA Children's Hospital, Trenton's treatment team included, among others, Dr. Lim, the admitting pediatric attending cardiologist, Dr. West, a new pediatric cardiology fellow-in-training, and Ms. Dean, a registered pediatric nurse employed by the Commonwealth of Virginia.

On the morning of August 21, 2009, Trenton received an intravenous dose of Propanolol. Shortly thereafter Trenton died. Stephanie A. Roush and Jason C. Roush, as Administrators of the Estate of Trenton Curry Roush, deceased, allege, *inter alia*, that Dr. West committed acts of negligence by failing to obtain a complete and adequate history, failing to listen, record, and pass on information regarding Trenton's recent ingestion of Atenolol, failing to communicate relevant information to Dr. Lim, the attending physician on-call, and improperly medicating Trenton with Propranolol. (Am. Compl. ¶ 13.) (The Plaintiffs have withdrawn additional allegations against Defendant West relating to inadequate attempted resuscitation. *See* Pl's Opp'n to Defs' Suppl. Mem. of Law at 4, n. 4.)

At the time of Trenton's death, Dr. West was a board certified pediatrician but was only six weeks into his three-year fellowship in the subspecialty of pediatric cardiology at the Medical School of the University of Virginia. (Hr'g Tr. at 8, 29; West Dep. Tr. at 6-8.) Prior to starting his fellowship in pediatric cardiology, Dr. West was a practicing pediatrician in the state of Georgia. As a practicing pediatrician, Dr. West had taken a significant number of patient histories. (West Dep. Tr. at 89-91.) Dr. West was also a clinical instructor in the area of pediatrics at the Medical College of Georgia School of Medicine. At the Medical College of Georgia, Dr. West taught his students how to properly take patient histories. (Hr'g Tr. at 34-36.)

As a new pediatric cardiology fellow at UVA, Dr. West was expected to be supervised by the attending physician, Dr. Lim, and the senior fellow, Dr. Sheterra Walker, on at least a day to day basis. (*Id.* at 13, 30-31.) On August 20, 2009, Dr. West had two conversations over the phone with Dr. Lim before Trenton even arrived at UVA. (*Id.* at 16.) In the second conversation, Dr. Lim instructed Dr. West to see the patient in the emergency department

at UVA, find out more detail about what happened both before and after the child went to Winchester, evaluate the child, and report back for receipt of further instructions. (*Id.* at 20.) Obeying Dr. Lim, Dr. West reviewed the records, talked with the emergency department physicians, examined the patient, and talked to Trenton's mother. (*Id.* at 21.) At the time Dr. West was seeing Trenton in the emergency room, however, he was neither directly supervised by an attending nor was he specifically instructed by anyone else as to what questions to ask or how to ask the questions. (*Id.* at 21, 35, 50.) In fact, when performing the history and physical exam, Dr. West used a standard form provided by the hospital that is required to be used on every patient who is admitted. (*Id.* at 32-33.) No direct review of the form itself was conducted until after Trenton died. (*Id.* at 31-32.)

The form that was used by Dr. West was entitled UVA Children's Hospital — Pediatric Cardiology Exam. (*Id.* at 42; Hr'g Ex. 1.) Dr. West testified that he was not obligated to follow the form in its entirety and that he did have a choice about what questions to ask. (Hr'g Tr. at 34-36.) He further admitted that it is routine to follow the form subject by subject and that, while examining Trenton, he did not deviate from the form in any way. (*Id.* at 34-36, 41.) The form used by Dr. West was not unusual or significantly different from the forms Dr. West had used in the past. Finally, Dr. West noted that, if he had obtained any noteworthy history not listed on the form, then he would have added that to the chart. (*Id.*)

Although he had much experience in taking pediatric patient histories and conducting physical exams, Dr. West had little to no experience in taking the history of a patient with a record of severe congenital heart disease. (*Id.* at 42, 45-46.) Taking a complete history and performing a physical examination is part of the core curriculum of the UVA pediatric cardiology fellowship, and it is part of the core curriculums recommend by the American College of General Medical Education for all fellowships. (*Id.* at 29.) At UVA, one of the primary goals of the education of first-year fellows consists of reviewing the history and physical. (*Id.* at 45.) This is also one of the reasons why there is a senior fellow on call, who supervises the junior fellows during the first two to three months. (*Id.*)

Although Dr. West was not supervised while taking Trenton's history, Dr. West did, however, discuss the patient and his history shortly afterwards with Dr. Sheterra Walker, a senior fellow required to supervise Dr. West. (*Id.* at 21-22, 43.) Following that conversation, Dr. West called Dr. Lim to report his findings and share the information he had obtained. (*Id.* at 16.) The two discussed Trenton's reports, the history Dr. West obtained, the physical exams, past labs, and other records. (*Id.* at 24.) Concerning the history specifically, Dr. Lim asked many questions as to the contents and sources of the information obtained. (*Id.* at 28-29.) Later, Dr. Walker, Dr. West, and Dr. Lim all discussed and formed a treatment plan for Trenton. As the attending physician, it was Dr. Lim's decision whether to admit

Trenton, which drugs should be prescribed, and to which unit Trenton would be admitted. (*Id.* at 24-27.)

On August 20 and 21, 2009, Nurse Dean was a fully trained and licensed pediatric nurse with over twenty-five years of experience. (Dean Dep. Tr. 7, 74, 77.) That night, she was assigned to the floor 7 Acute, the floor to which Trenton Roush was admitted. (*Id.* at 9.) With respect to Trenton Roush, Nurse Dean's responsibility was to observe, take and carry out orders from those above her in the chain of command, and to report any abnormalities in Trenton's condition. (*Id.* at 77-78.) That night, Nurse Dean was not under direct supervision, nor was she being trained or taught. Instead, she was functioning strictly as a practicing nurse. (*Id.* at 78.)

Plaintiffs allege that Nurse Dean was informed by Trenton's parents that the decedent had been given Atenolol, a type of beta blocker, and that Nurse Dean was warned about the potential of an overdose by beta blockers. (Am. Compl. ¶¶ 16-17.) According to the Plaintiffs, Nurse Dean, despite this information, failed to inform any involved physician, failed to evaluate herself of the potential overmedication, and negligently administered Propranolol. (*Id.* ¶ 17a-c.) Nurse Dean is also accused of not having the appropriate resuscitative measures available, failing to connect the decedent to a telemetry unit, failing to remain with the decedent during the infusion of Propranolol, and failing to appropriately set alarms to alert medical staff of the patient's worsening condition during infusion. (*Id.* ¶ 17d-g.)

## Issues Presented

A. Is Nurse Dean, a state employee and registered nurse who provided medical care to patients that were enrolled in specialized programs at the Medical Center, entitled to the protection of sovereign immunity?

B. Is Dr. West, a licensed, board-certified, medical doctor enrolled in a fellowship at the Medical School of the University of Virginia, entitled to sovereign immunity in connection with his taking a patient's medical history?

## Legal Analysis

There is no single, all-inclusive rule that can be applied to determine when an employee of the Commonwealth of Virginia is entitled to the protection of sovereign immunity in an action based on alleged acts of simple negligence. *James v. Jane*, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980). Rather, to determine who is eligible, a court must apply the four-factor test first articulated in *James v. Jane* and further set forth in *Messina v. Burden*, 228 Va. 301, 321 S.E.2d 657 (1984). *McCloskey v. Kane*, 268 Va. 685, 689, 604 S.E.2d 59, 61 (2004). The four factors to be considered are:

(1) The nature of the function performed by the employee;

(2) The extent of the state's interest and involvement in that function;

(3) The degree of control exercised by the state over the employee; and

(4) Whether the alleged negligent act involved the use of judgment and discretion.

*Messina*, 228 Va. at 313, 321 S.E.2d at 663. While there is no disagreement among the parties that both Dr. West and Nurse Dean are subject to the *James v. Jane* test, the parties do disagree as to its application in the case at bar.

## A. *Degree of Control Exercised by the State*

The first factor examined in deciding whether the veil of sovereign immunity applies to Nurse Dean and Dr. West is the degree of control the state exercised over them. A high level of control by the Commonwealth weighs in favor of immunity. *Lohr v. Larsen*, 246 Va. 81, 88, 431 S.E.2d 642, 646 (1993). Conversely, a low level of control weighs against immunity. *Id*. Plaintiffs concede that the Commonwealth exercised significant control over both Nurse Dean and Dr. West. (Pls' Opp'n to the Plea of Sovereign Immunity at 4.) But since the *James v. Jane* test contains four "factors to be considered," *Messina*, 228 Va. at 313, 321 S.E.2d at 663, and not four elements that must be satisfied, the extent of the Commonwealth's control over Nurse Dean and Dr. West will be examined.

The Commonwealth, through the University of Virginia Medical Center, exercised substantial control and direction over the actions of Nurse Dean and Dr. West. Unlike the physicians in *James v. Jane*, Nurse Dean and Dr. West had no choice in which patients were admitted or whom they would care for, had no input with regard to patient billing, were subject to the established protocols and procedures of the Medical Center, and were paid in the form of a salary and not on the basis of the patients they saw. These facts establish that both Dr. West and Nurse Dean were subject to significant state control and weigh in favor of granting sovereign immunity.

## B. *The Use of Judgment and Discretion*

Despite this noteworthy level of control, Nurse Dean and Dr. West both exercised a limited, but sufficient level of discretion over their actions. Virtually every act performed by a person involves the exercise of some discretion. High levels of discretion exercised by a state-employee, however, weigh in favor of immunity. *Lohr*, 246 Va. at 88, 431 S.E.2d at 646. Nevertheless, the amount of discretion is not always determinative. *James*, 221 Va. at 53, 282 S.E.2d at 869.

### 1. *Nurse Dean*

There can be no doubt that, in caring for her patients, Nurse Dean was required to make judgments and exercise substantial discretion. Under the *James v. Jane* test, however, the overall amount of discretion enjoyed by the employee is not what is examined. Instead, what is at issue is the amount of discretion exercised in the "act performed." *Id.* While the administration of medicine and application of telemetry in accordance with doctor's orders does not necessarily involve an abundance of discretion, it is clear that Nurse Dean retained a sufficient amount of discretion and judgment as to how to perform those tasks. Nurse Dean also exercised an adequate amount of discretion in how to best monitor, observe, and care for Trenton. These facts weigh in favor of granting Nurse Dean sovereign immunity .

### 2. *Doctor West*

Dr. West consistently employed high levels of discretion on the night of August 20, 2011. In examining Trenton and taking his history, Dr. West received no direct guidance besides the aid of a standard form. The form contained only topics to be covered, and not detailed instructions. Further, Dr. West did not feel obligated to follow the form mechanically. Rather, he felt that he had a choice over what questions to ask. Dr. West therefore used his own judgment in formulating the questions he asked as well in writing down what he deemed to be the pertinent information from the answers he received. As Dr. West noted, if he had obtained significant history not on the form, then he would have addressed that on the chart.

Similarly, Dr. West in conferring with Dr. Lim, his supervising attending, relied on his judgment and discretion as to what information should be relayed. Dr. West was not asked nor required to take all of the information he received and repeat it verbatim to Dr. Lim. Instead, he used his discretion to determine what was relevant; therefore, despite the fact that many of the allegedly negligent acts performed by Dr. West were guided by a form, Dr. West retained more than enough discretion to establish that this factor weighs in favor of granting immunity.

## C. *The Function Performed and the State's Interest in That Function*

Two of the *James v. Jane* factors, the function performed by employee and the Commonwealth's interest in that function are considered together, for they are related and interdependent. *Hey v. University of Va. Health Servs. Found.*, 80 Va. Cir. 360, 363, 2010 Va. Cir. LEXIS 168 (Charlottesville 2010); *see also Lohr*, 246 Va. at 85, 431 S.E.2d at 644; *Gargiulo v. Ohar*, 239 Va. 209, 213, 387 S.E.2d 787, 789-90 (1990). This is necessarily so

because, when the function that a government employee was performing is essential to a significant governmental objective, there is a presumption in favor of granting immunity. *Lohr*, 246 Va. at 85, 431 S.E.2d at 644. But if the employee's function has only a marginal bearing upon a governmental objective and the government's interest is "slight," granting immunity is disfavored. *Id.*

### 1. *Nurse Dean*

Even though the control and discretion factors weigh in favor of granting Nurse Dean the protection of sovereign immunity, the nature of the function performed by her as well as the Commonwealth's interest in that function weigh in the opposite direction. Nurse Dean argues that, because she is a nurse who cares for pediatric cardiology patients at the Medical Center, the Commonwealth has a strong enough interest in her function for her to be afforded the protection of sovereign immunity. To support this contention, Nurse Dean relies on the highly specialized nature of the pediatric cardiology clinic and the fact that the Medical Center has created a specific treatment and monitoring regime for patients like Trenton, the Home Single Ventricle Surveillance Program. Nurse Dean further points to the fact that the Medical Center's pediatric cardiology program is the only one of its kind in Virginia. Given this unique status, it receives referrals from localities throughout the Commonwealth as well as from other states. For these reasons, Nurse Dean argues that her function serves such a vital state interest that she should be afforded the protection of sovereign immunity just like the doctor in *Lohr v. Larsen*.

In *Lohr v. Larsen*, the Supreme Court of Virginia found a licensed medical doctor was to be entitled to sovereign immunity because his position and duties as a public-health physician were essential to the Commonwealth's statutorily-established objective of preserving public health in underprivileged areas. 246 Va. at 86, 431 S.E.2d at 645. Indeed, the Commonwealth's interest in providing quality medical care to economically disadvantaged citizens was so substantial that it was determined to be "paramount." *Id.* at 88, 431 S.E.2d at 646.

The function of Nurse Dean in this case, however, is different from that of the doctor in *Lohr* and was primarily, if not entirely, involved in patient care writ large. Unlike the physician in *Lohr*, Nurse Dean lacked the level of discretion that was deemed to be an integral part of the Commonwealth's health program. Moreover, Nurse Dean's function as a pediatric nurse was not essential to the achievement of an articulated, "paramount" state interests. Such state interests include, but are not necessarily limited to, the operation of a medical school and training physicians to teach in and to administer the school, *James*, 221 Va. at 54, 282 S.E.2d at 870, the thorough training and maintaining of a pool of medical specialists skilled in a particular

discipline, *Gargiulo*, 239 Va. at 213, 387 S.E.2d at 790, and the provision of quality medical care for citizens in economically disadvantaged areas who are otherwise unable to secure such services from the private sector. *Lohr*, 246 Va. at 86, 431 S.E.2d at 645 (finding the provision of medical services to the poor to be integral to "the protection, improvement, and preservation of the public health [which is] essential to the general welfare of the citizens of the Commonwealth." (Quoting Va. Code § 32.1-2).)

Nurse Dean's core function was to provide medical care to an individual patient and was essential to none of the above goals. Nurse Dean was not involved in any state-sponsored research, was not a student or intern trying to pursue further specialized training, and was not primarily involved in teaching. Instead, her function is most analogous to the doctors who were denied sovereign immunity in *James v. Jane*. In *James*, the Supreme Court of Virginia noted that, despite the Commonwealth's general "interest[] and concern[]" that patients receive proper medical care, the interest Virginia has in its sovereign capacity concerning the treatment of a specific patient is "slight." *James*, 221 Va. at 54, 282 S.E.2d at 870; *see also Gaines v. Health Servs. Found.*, 80 Va. Cir. 336, 343, 2010 Va. Cir. LEXIS 176 (Charlottesville 2010) (finding that the primary function of several nurses employed at the University of Virginia Hospital was the provision of patient care and holding them not entitled to sovereign immunity); *Houchens v. Rector & Visitors of the Univ. of Va.*, 23 Va. Cir. 202, 210-12, 1991 Va. Cir. LEXIS 84 (Charlottesville 1991) (denying sovereign immunity to highly specialized nurses whose primary function was patient care).

No doubt, the Commonwealth maintains a general interest in ensuring that its citizens have access to highly specialized care like that provided at the Medical Center's pediatric cardiology program. As stated in *James*, however, the Commonwealth does not have a strong interest and concern as to the medical treatment of a specific patient. *See James*, 221 Va. at 54, 282 S.E.2d at 870. Because Nurse Dean was primarily providing care to an individual patient and was not functioning in furtherance of a statutory or judicially-recognized paramount state interest, granting Nurse Dean's plea of sovereign immunity would be inconsistent with established precedent.

### 2. *Doctor West*

On the night of August 20, 2009, Dr. West was tasked with the responsibility of evaluating Trenton's condition and taking his medical history. In that role, Dr. West was functioning as a student in UVA's pediatric cardiology program. Because Dr. West was acting as a student under supervision in that program when he took Trenton's history, Dr. West was performing a function essential to the achievement of a paramount state interest. *See Gargiulo*, 239 Va. at 213, 387 S.E.2d at 790. That fact that he was undertaking a training function in the state's interest weighs

strongly in favor of granting sovereign immunity. *See Lohr*, 246 Va. at 85, 431 S.E.2d at 644. But it is not, as Dr. West claims, Dr. West's status as a fellow in pediatric cardiology at the University of Virginia Medical Center that entitles him to immunity. The Supreme Court of Virginia has never held that medical residents or interns must be entitled to sovereign immunity based solely on their status as physicians in training.

Although the Supreme Court of Virginia has twice found medical interns to be entitled to sovereign immunity, in both of those cases, the interns were being closely supervised and under the direction of attending physicians. For example, in *Lawhorne v. Harlan*, 214 Va. 405, 200 S.E.2d 569 (1973), *overruled on other grounds by First Va. Bank-Colonial v. Baker*, 225 Va. 72, 301 S.E.2d 8 (1983), the Court held that a surgical intern engaged in postdoctoral training at the University of Virginia Hospital was immune from liability for simple negligence. Because *Lawhorne* predates *James v. Jane*, it did not apply the same formula. The *James* court did, however, note that the surgical intern in *Lawhorne* "was, because of his inexperience, closely controlled, supervised, and directed by his employer," and therefore was entitled to sovereign immunity. *James*, 221 Va. at 54, 282 S.E.2d at 869.

In *Gargiulo v. Ohar*, the Virginia Supreme Court granted sovereign immunity to a licensed doctor in a fellowship because she was at the time participating as a student in a research project expressly conferred by the General Assembly. 239 Va. at 213, 387 S.E.2d at 790. In discussing the nature of the employee's function, the Supreme Court concluded that the allegedly negligent acts were performed by the employee in her capacity as a student which was a function "essential to achievement of the Commonwealth's goal . . . of training and maintaining a pool of specialists skilled in a particular discipline." *Id.*

In line with that paramount state interest, interns and residents have consistently been afforded the protection of sovereign immunity for acts they performed while in training and under supervision. *See, e.g., Hey*, 80 Va. Cir. at 366, 2010 Va. Cir. LEXIS 168; *Shelton v. Univ. of Va.*, 80 Va. Cir. 353, 356, 2010 Va. Cir. LEXIS 167 (Charlottesville 2010); *Carter v. University of Va. Health Sys.*, 52 Va. Cir. 416, 420, 2000 Va. Cir. LEXIS 306 (Charlottesville 2000); nevertheless, guided by the Virginia Supreme Court's decision in *Lee v. Bourgeois*, 252 Va. 328, 333, 477 S.E.2d 495, 499 (1996) (holding that despite the paramount state interest in having a good medical school, a medical school professor was not entitled to sovereign immunity when he functioned as an attending physician), this Court has declined to grant sovereign immunity to interns or residents whose alleged negligence occurred while they were functioning essentially without supervision in a manner similar to a private physician. *See, e.g., Lilly v. Brink*, 51 Va. Cir. 444, 448, 2000 Va. Cir. LEXIS 67 (Orange County

2000); *McDonald v. Hoard*, 48 Va. Cir. 421, 426, 1999 Va. Cir. LEXIS 109 (Charlottesville 1999).

Thus, crucial to the Court's decision is not Dr. West's status as a pediatric cardiology fellow, but whether he was functioning as one when he was taking Trenton's history. If Dr. West was functioning as a fellow-in-training and under supervision, then he would have been acting in furtherance of the Commonwealth's paramount goal of training and maintaining a pool of medical specialists. *See Gargiulo*, 239 Va. at 213, 387 S.E.2d at 790. If, however, Dr. West was acting without direction or supervision, in a role analogous to that of a private physician, then he was functioning as a provider of individual patient care. If this were the case, the Commonwealth's interest in Dr. West's function would be only "slight," and sovereign immunity would be strongly disfavored. *See James*, 221 Va. at 54, 282 S.E.2d at 870.

Looking at the circumstances surrounding the acts Dr. West performed on August 20, 2009, at all relevant times, he was functioning as a student under supervision and not as a private, fully trained physician. Although Dr. West was adept at taking pediatric histories from general pediatric patients, he lacked experience in taking histories from infants with a record of severe congenital heart disease. The taking of patient histories was a cornerstone of his fellowship, and, because of his inexperience, Dr. West was required to be under a significant amount of supervision from both his attending and his senior fellow. Furthermore, Dr. West did not admit, diagnose, treat, or prescribe any medications to Trenton. *Cf. Lilly*, 51 Va. Cir. at 448, 2000 Va. Cir. LEXIS 67 (holding a resident who admitted, examined, diagnosed, and released a patient on his own to have functioned as a doctor and not a student). Rather, every major act he performed was directed by his attending and then subject to supervision shortly thereafter. Specifically, it was Dr. Lim who directed Dr. West to take Trenton's history and then to report back for further instruction afterwards. In conferring with Dr. Lim after he took the history, Dr. West was subject to a variety of questions regarding the content and source of his information.

The fact that Dr. West was not subject to bedside supervision and direction when he was taking Trenton's history does not mean that he was acting outside his function as a cardiology fellow. For example, this Court, in *Hey v. University of Va. Health Services Foundation*, held that residents who provided medical examination and treatment to a patient without complete side-by-side instruction from an attending were entitled to sovereign immunity. 80 Va. Cir. at 366, 2010 Va. Cir. LEXIS 168. In *Hey*, the residents were found to be functioning as students and not treating physicians because they relied on the instruction and direction of their attending and sought his guidance and approval at critical stages during the course of their patient's treatment. *See id.* Like the residents in *Hey*, Dr. West received direction from his attending but did not receive instruction

for every act he performed nor was he subject to constant supervision. *See id.* at 365-66, 2010 Va. Cir. LEXIS 168. Similarly, Dr. West sought out the guidance and approval of Dr. Lim on several occasions. In fact, it was in one such conversation that Dr. Lim instructed Dr. West to take Trenton's history. As in *Hey*, here the lack of instruction or supervision by a teacher over a student's discrete act does not automatically transform a student into a treating physician. Because Dr. West sought out the guidance of his attending, received instruction from him, was under his general supervision, subsequently conferred with him, and was performing a task required by his educational program, he was functioning as a cardiology fellow-in-training.

Given Dr. West's student function and the Commonwealth's recognized interest in medical education and training of a "pool of specialists skilled in a particular discipline," *see Gargiulo*, 239 Va. at 213, 387 S.E.2d at 790, these factors weigh heavily in favor of granting Dr. West the protection of sovereign immunity.

## Conclusion

Based on the weight of the evidence and the reasons set forth above, Nurse Dean's special plea of sovereign immunity must be denied, and Dr. West's special plea of sovereign immunity should be granted.